DRESSER INDUSTRIES, INC., Plaintiff,

v.

ELTRA CORPORATION, Defendant.

No. C 69–613.

United States District Court,
N. D. Ohio, E. D.

June 11, 1977.

154

John Lansdale Jr., Squire, Sanders & Dempsey, Cleveland, Ohio, Arthur G. Connolly, Connolly, Bove & Lodge, Wilmington, Del., Robert W. Mayer, Dresser Industries, Inc., Dallas, Tex., for plaintiff.

John Ladd Dean, Cleveland, Ohio, John C. Purdue, Owen, Purdue, Emch & Barker Co., Toledo, Ohio, Dugald S. McDougall, McDougall, Hersh & Scott, Chicago, Ill., for defendant.

## MEMORANDUM AND OPINION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALINSKI, District Judge:

### JURISDICTION AND STATEMENT OF CASE

This cause came to be tried by the Court, without a jury, between August 7 and August 16, 1973. It is an action for infringement of plaintiff's Patent Number 3,275,-461, entitled "Refractory", which was issued on September 27, 1966, to plaintiff's predecessor, Harbison-Walker Refractories Company, as the assignee of Ben Davies and Peter H. Havranek. Plaintiff owns the patent; no issue of title is involved.

The Court has jurisdiction over the parties and the subject matter of this action. Jurisdiction of the subject matter is based on 28 U.S.C., § 1338(a), and the Patent Laws of the United States. Venue is based on 28 U.S.C., § 1400(b), and is proper.

The subject matter of the patent in suit is the manufacture of burned magnesite refractory bricks, commonly used as linings for steelmaking vessels known as Basic Oxygen Furnaces. Both parties are manufacturers of such bricks.

The patent in suit covers a brick used in the steelmaking industry whose chemical composition yields particularly attractive physical properties. The unusually high hot strength and heat resistance enables processors of steel utilizing the Basic Oxygen Process to run many more molten batches ("heats") before it becomes necessary to replace the protective linings of the furnaces, an obvious saving in labor, material, and furnace down time. Plaintiff herein seeks to enjoin the manufacture and sale by the defendant of a brick which allegedly infringes upon the patent in suit, and plaintiff further seeks to collect damages for past infringement by defendant.

### FINDINGS OF FACT

1) The period from the mid-1950's to the mid-1960's marked a transition in the manufacturing of steel in that the Basic Oxygen Furnace (BOF) began to replace the open hearth method. (R. 35–41.)

2) BOFs were first introduced in the United States in about 1959. (PT 4, No. 120.)

3) European steelmakers had begun making the transition to BOFs of various types prior to the transition made by steelmakers in the United States. (PT 19, Volumes 1 and 2.)

4) On December 11, 1962, plaintiff learned that brick made of Turkish magnesite, burned and tar impregnated, made by

Veitscher Magnesitwerke of Austria (hereinafter Veitsch) had attained 200 "heats" in a Kaldo vessel at Domnarvet, Sweden. Plaintiff was also aware of the fact that the same type brick was reported to have endured more than 800 "heats" in an LD vessel at Linz Donawitz, Germany, earlier that year. Mr. Davies, one of the inventors, was present at that meeting. (PT 152.)

5) Prior to December 20, 1962, plaintiff was aware that a burned, tar impregnated brick, composed of Austrian magnesite, having an Mg0 content of 87%, had endured 92 "heats" in a Kaldo vessel at Domnarvet, Sweden. (PT 152.)

6) During 1962–1964, Sharon Steel, Sharon, Pennsylvania, was in the process of testing refractories for its two 100-ton Kaldo vessels. (DT BR.)

7) From a letter dated March 27, 1963, which was received by plaintiff on April 1, 1963, plaintiff learned that a Kaldo vessel at Oxelösund, Sweden, which was purportedly the same size as the vessels at Sharon Steel, had undergone 111 "heats" without any patching, using a brick called Anker T. (PT 154.)

8) The same person who informed plaintiff of the results of the Anker T test at Oxelösund, Sweden, indicated in his letter of March 27, 1963, that he had sent a piece of the lining, i. e., a fragment of the brick used in the lining, which had endured the 111 "heats" mentioned above. (PT 154.)

9) From October 16, 1962, to April 21, 1963, plaintiff tested some of its various refractories in the 100-ton Kaldo vessels at Sharon Steel, including its 78–62 refractory brick and its 7–63 refractory brick. (DT BR.) Plaintiff later denominated the 78–62 refractory brick as Oxiline B and the 7–63 refractory brick as Oxibak H. (R. 280.) The refractory brick manufactured under the patent in suit were marketed under the Oxiline B and Oxibak H designations. (R. 51–53.)

10) Plaintiff's 78–62 and 7–63 refractory bricks were made from a brickmaking compound designated by plaintiff as 31–62 grain. (R. 341, 343, 381.)

11) Originally, the 31–62 grain, the 78–62 refractory brick, and the 7–63 refractory brick were made under the teachings of plaintiff's U. S. Patent Number 3,141,790. (R. 384; PT 27.)

12) The lining which plaintiff installed on April 21, 1963, at Sharon Steel's 100-ton Kaldo vessel attained 62 "heats", the highest number of "heats" attained by any of plaintiff's products in Sharon's Kaldo vessels. (DT BR.)

13) Plaintiff's 78–62 and 7–63 refractory bricks were excellent refractory bricks for BOFs, probably the best high purity magnesite refractory bricks manufactured in the United States in 1962 and 1963, and they had a modulus of rupture at 2300° F of about 1000 to 1500 psi and 150–260 psi at 2600° F. (PT 100; PT 50; PT 59.)

14) The 31–62 grain was manufactured from a magnesium hydrate slurry supplied to plaintiff at Ludington, Michigan, by Dow Chemical Company. (DT HD.)

15) Plaintiff made two products from Dow's magnesium hydrate, one called 98 grade magnesite and the other called 31–62 grain. The only difference between the two products was that controlled percentages of lime were added to the slurry for the 31–62 grain to maintain a lime/silica (C/S) ratio between 3:1 to 4:1. (DT HD.)

16) Prior to December, 1962, the normal method used by plaintiff to make the lime addition to the magnesium hydrate slurry was that of using lime hydrate. In December, 1962, plaintiff, as an economy measure, began making the lime addition by using hydrated Gibsonburg dolomite rather than the Mississippi hydrated lime. (PT 33, p. 5.)

17) On January 10, 1963, the inventors initiated a study on the effect of adding lime in form of hydrated dolomite instead of lime hydrate in its manufacture of 31–62 grain and the resultant effect upon the physical properties of the 78–62 brick which was made from that grain. (PT 33.)

18) In a laboratory report, dated March 12, 1963, the inventors determined that brick made from the 31–62 grain that had been made with the hydrated dolomite had

physical properties which were satisfactory in comparison with the physical properties of 7–63 brick which plaintiff had previously produced with the exception of the fact that the hot strength of the brick made from the new grain at 2300° F was only half that of the 7–63 brick previously made by plaintiff's research center. (PT 33.)

19) The same report indicated that the boron content of 0.3% $B_2O_3$ was abnormally high for that type of brick, and the report further indicated that the effect of the boron content on hot strength of the brick manufactured from this grain was being investigated. (PT 33.)

20) Although the report indicated that the cause of the weakness of the brick made from the 31–62 grain to which the lime had been added as hydrated dolomite was unknown, the report indicated that the aim of the research program was to find an explanation for the low hot strength of the brick. (PT 33.)

21) There is no document of record prior to May 28, 1963, which indicates that the inventors conducted any experiments to determine the effect of $B_2O_3$ contents which were lower than the normal range of 0.10% to 0.14% which plaintiff had encountered in its products made from the magnesium hydrate it received from Dow Chemical.

22) On April 1–3, 1963, the inventors, Ben Davies and Peter Havranek, attended an engineering meeting in Buffalo, New York, during which time the inventors had a conversation with Doctor William C. Gilpin of Steetley Company, an English company. (PT 155; R. 446–447, 561–567.)

23) Doctor Gilpin informed the inventors that Steetley had managed to obtain samples of the "Ankor T" (sic) brick made by Veitsch that had been successful in the Kaldo vessel at Domnarvet, Sweden, and Doctor Gilpin further related to them that the distinguishing feature of the brick was its "' enormous strength at high temperatures and excellent spalling resistance.'" (PT 155.)

24) Doctor Gilpin informed them that the Anker T was a burned brick made from Turkish magnesite and that it was tar impregnated. He further stated that he did not know the exact source of the Turkish magnesite, but he indicated that "they (presumably Steetley and himself) have been able to make brick similar to 'Ankor T' (sic) using dead burned Grecian magnesite with a similar composition to the Turkish." (PT 155.)

25) On April 4, 1963, Ben Davies, one of the inventors, called plaintiff's home office to inquire about the "possible source of magnesite used by the Austrians for use in the manufacture of brick for the Swedish Kaldo vessels" which Doctor Gilpin had informed him of at the meeting in Buffalo, New York. (DT HA; R. 565.)

26) On April 5, 1963, Carl A. Tate, an executive of plaintiff's organization, by letter, responded that:

a. The only magnesite obtainable from Turkey was of a crude variety since there were no dead burning facilities in that country;

b. Crude Grecian magnesite samples which had been received by the British Periclase Company were the closest in composition to the Turkish crude magnesite; and

c. Samples of the dead burned Grecian magnesite were "in your hands at Garber Research Center." (PT 156.)

27) By April 12, 1963, the samples of Grecian dead-burned magnesite which plaintiff had available to it had been chemically analyzed and found to contain less than 0.01% of $B_2O_3$. (DT HA, No. 4.)

28) On April 19, 1963, plaintiff's research center received a sample of Anker T brick from an employee of Svenska Silikaverken, its agent in Sweden. (PT 154; DT HA, No. 11.)

29) The Anker T fragment received by plaintiff on April 19, 1963, was subjected to spectrochemical analysis on or about May 9, 1963. (DT HA, No. 11.)

30) On May 8, 1963, Ben Davies and E. P. Weaver indicated that plaintiff has received a used fragment of "Ankor T" (sic) brick,

which was a "burned and impregnated magnesite brick made by Veitscher Magnesitwerke, Austria," and that it had been "obtained after 111 heats in the Oxelösund Kaldo vessel." The report indicated that the tests conducted on the sample would be limited since it was only a small fragment of a used brick. The data obtained was to be reported under Laboratory No. B 7817. (DT AT.)

31) The spectrochemical analysis of the fragment of the used Anker T brick which was conducted by plaintiff's laboratory on or about May 9, 1963, indicated a $B_2O_3$ content of 0.03%. (DT HA, No. 11.)

32) On or about May 28, 1963, Ben Davies and Peter Havranek wrote an Invention Record which purportedly reflected their conception of the invention in its broadest terms. (PT 34.)

33) The Invention Record indicated that its subject and purpose concerned "Magnesite brick with lime silica ratio between 3/1 and 4/1 and controlled $B_2O_3$ content that has high hot strength." (PT 34.)

34) The Invention Record contained the following statement:

"Burned magnesite brick with a lime silica ratio between 3 and 4 to 1 have hot strength that varies over a wide range for no apparent reason. We have found that this variation is affected in an important way by the boron oxide content of the brick. A change in boron oxide content from .18% to 0.28% reduced the strength of the brick at 2300° F from the 1000 to 1200 psi range to the 400 to 500 psi range. Further increases in $B_2O_3$ content reduced the strength to 80 psi. Some data is available that suggests that reducing the $B_2O_3$ content below 0.05% (sic) magnesite with strength at 2300° F *well over 2000 can be produced.*"[1] (PT 34.) (*Emphasis added.*)

35) The first recorded experiment conducted by the inventors in which the $B_2O_3$ content of plaintiff's 31–62 grain was reduced below its normal value of 0.01%–0.14% exists in this record as a Work Order dated June 3, 1963. (PT 39.)

36) Under plaintiff's research priority classification system, the highest priority available was Class I. The next highest priority was Class II. Under this system work orders bearing the highest priorities were to be given precedence over lower priority projects. (R. 29–30; 766–767.)

37) A notation at the top of the Work Order that had been initiated on June 3, 1963, indicates that the priority of the project was changed to Class II on June 10, 1963. (PT 39.)

38) An additional notation at the top of the Work Order indicates that the chemical analysis was changed to a Class II + priority July 18, 1963. (PT 39.)

39) The only data available to plaintiff prior to June of 1963 which indicated $B_2O_3$ contents of less than 0.05% were the reports of the analysis of the Grecian magnesite, made on April 12, 1963, and the analysis of the used sample of Anker T brick, made on May 9, 1963. (DT HA, No. 4A, No. 4B, No. 11.)

40) The inventor, Ben Davies, was aware of the fact that the used sample of Anker T brick was present at plaintiff's research center on May 8, 1963. (DT AT.)

41) Plaintiff's laboratory report, dated March 12, 1963, clearly indicates that the inventors and plaintiff were unaware of the specific cause of the unexpected weakness of the 7–63 refractories which were to be made from the 31–62 grain manufactured at the Ludington Works in December of 1962 using hydrated Gibsonburg dolomite instead of Mississippi hydrated lime. (PT 33.)

42) The study referred to in PT 33 in reference to determining the effect of $B_2O_3$ on hot strength is contained in PT 284. That study, begun on March 6, 1963, was an attempt to discover the effect of boron by *increasing* the $B_2O_3$ content. The final report in regard to the project is dated June 20, 1963. (PT 284.)

1. See the footnote to Finding of Fact No. 101.

43) A laboratory report on June 17, 1963, contains a synopsis of six reports dealing with studies aimed at "improving the density and hot strength of Mix 7–63." Paragraph 5 of that report indicates that an "addition of small percentages of $B_2O_3$ to Mix 7–63 sharply reduced the hot strength." The synopsis does not contain any report of any experimentation in regard to reducing $B_2O_3$ content below the normal range which plaintiff anticipated from the magnesium hydrate furnished to plaintiff by Dow, i. e., 0.10% to 0.14% on a calcined dead burned basis. (PT 36.)

44) Paragraph 7 of the same report referred to in Finding of Fact No. 43 above contained the following statement:

"To obtain improved strength of 7–63, it appears that $B_2O_3$ of 31–62 magnesite must be reduced below 0.03%. *Burned dolomite brick* made at GRC (Garber Research Center) with $B_2O_3$ content of 0.02% had strength at 2300° F of 2400 psi. Veitsch's Anker T, which is chemically the same as 7–63, but has only 0.03% $B_2O_3$, is reported to have very high hot strength." (*Emphasis added.*)

45) Mr. Davies indicated at trial that as of April 1, 1963, Anker T brick was a subject of interest to himself and Mr. Havranek at the time he had the conversations with Doctor Gilpin referred to in Findings of Fact Nos. 22–24 above.[2]

46) Mr. Tate, in response to a telephonic request by Mr. Davies on April 4, 1963,[3] by a letter dated April 5, 1963, further advised Mr. Davies that:

"(s)amples of dead burned Grecian magnesite made from the crude magnesite from which rock samples were selected are in your hands at Garber Research Center." (PT 156.)

47) The samples of Grecian magnesite referred to by Mr. Tate were five samples of Grecian magnesite supplied to plaintiff by Scalistiri Enterprises, Greece, sometime in January, 1963. (DT E.)

48) Plaintiff's laboratory analyzed the samples of Scalistiri Grecian dead burned magnesite by April 12, 1963, and learned from the chemical analysis that the Scalistiri magnesite contained less than 0.01% $B_2O_3$. (DT HA, No. 4a and No. 4b.)

49) The only other chemical analysis, prior to May 28, 1963, which revealed a $B_2O_3$ content of less than 0.05% was that of the used fragment of Anker T brick received by plaintiff on April 19, 1963, and subjected to chemical analysis by plaintiff on May 9, 1963. (DT HA, No. 11.)

50) Mr. Davies admitted during cross-examination that there was no evidence of any work done by himself or plaintiff's laboratory prior to June of 1963, which involved a magnesite *brick* with a boron content in the neighborhood of 0.03% except for the analysis which had been performed on the fragment of used Anker T brick. (R. 579–580.)

2. In a memorandum dated April 11, 1963, written by Mr. Davies and Mr. Havranek, the following statement in regard to the conversation with Doctor Gilpin was made:

"Steetley obtained samples of the Ankor-T (sic) brick made by Veitsch that were so successful in the Kaldo vessel at Domnarvet. Ankor-T (sic) is a hard burned brick made from Turkish magnesite and tar impregnated. The distinguishing feature of the brick was 'enormous strength at high temperature and excellent spalling resistance.' Gilpin mentioned figures such as 3000 psi modulus of rupture at 2300° F and spalling resistance higher than their manufacture of Harklase from our 98 grade magnesite. According to Gilpin the reason for these properties is the unusual distribution of the phrases in the Turkish magnesite. The MgO content is about 95% and the lime and silica occur in discrete pockets as dicalcium silicate, and there are virtually no silicate films around the magnesite grains. He stated 'there is very good direct bonding between the magnesite grains, and because of the phase relation this magnesite acts as if it were 99% pure.'

"Gilpin did not know the exact source of the Turkish magnesite, but stated that they have been able to make brick similar to Ankor-T (sic) using dead burned Grecian magnesite with a similar composition to the Turkish." (PT 155.)

3. Mr. Davies testified at trial that though he could not remember the phone call made to Mr. Tate on April 4, 1963, he would certainly say that he did make the phone call on that date. (R. 564–566.)

51) On May 15, 1963, the inventors initiated an investigation to determine the effect of a delay in the pressing of a brick-making batch after the time it was mixed. The study related to plaintiff's 7–63 brick. The final report, dated June 13, 1963, indicated that brick manufactured from a batch to which a 0.2% *addition* of boric acid was made had a lower modulus of rupture at 2300° F than brick made from the other batches to which no such addition was made. The primary emphasis of the report, however, was upon the effect of delay between the time of mixing and the time of pressing the brick-making batch. (PT 217.)

52) On May 16, 1963, the inventors initiated a study to determine the effect grain-sizing had upon plaintiff's 7–63 brick. The final report, dated June 12, 1963, indicated that of the bricks studied the highest density strength was achieved in brick with a screen analysis in the range specified for the then current production of 7–63 brick. (PT 218.)

53) A laboratory report, dated June 12, 1963, indicated that the hot strength of the 7–63 brick was not increased significantly by raising the burning temperature over the range of 2650° F to 3200° F. The report further indicated that this testing eliminated the "burning step as a potential source of difficulty in manufacturing Mix 7–63 with high hot strength." (PT 219.)

54) On April 23, 1963, plaintiff initiated an investigation to discover the effect of porosity on modulus of rupture at 2300° F in relationship to the hot strength of the 7–63 brick. The first sentence of the final report, dated June 13, 1963, indicates that the report was part of "an extensive study aimed at determining the causes of variable hot strengths of H–W 7–63 brick manufactured at Hammond." The report further indicated the hot modulus of rupture at 2300° F showed a direct relationship between hot strength and density. The report also contained the following statement:

"The density and porosity of Mix A was very similar to that of the Veitscher Anker T brick which had given good service in the Kaldo vessel in Sweden, whereas the physical properties of Mix D are representative of our present production of H–W 7–63." (PT 285.)

55) On May 20, 1963, plaintiff initiated a Class II study of the effect of high temperature burning on 7–63 brick. The final report, dated June 13, 1963, indicated that the temperature of the burn did not significantly effect the hot strength at 2300° F. The report further indicated that an addition of 0.2% $B_2O_3$ adversely affected the hot strength of the brick at 2300° F. (PT 35.)

56) In a study begun on March 6, 1963, plaintiff sought to determine the effect of *increasing* the $B_2O_3$ content of its 7–63 brick. The final report, dated June 20, 1963, indicated that increase in the $B_2O_3$ content adversely affected the hot modulus of rupture of the brick having a dicalcium silicate matrix. (PT 284.)

57) The Court finds that the research projects discussed in Findings of Fact Nos. 51–56 were the culminating phase of the project initiated in January, 1963, to determine the cause of the low hot strength of the brick made from the 31–62 grain to which the hydrated Gibsonburg dolomite had been added. (PT 36.)

58) On June 3, 1963, plaintiff initiated its first investigation related to the *reduction* of the $B_2O_3$ content of its 31–62 grain (PT 39.)

59) On June 10, 1963, the priority of the project was raised to Class II, and on July 18, 1963, the priority of the project was further increased to Class II+. (PT 39.)

60) As originally envisioned, the inventors planned to remove $B_2O_3$ from the Ludington 98 grade hydrate rather than from the 31–62 grain. (PT 39.)

61) In a letter dated in late May or early June of 1963, Mr. John Replogle, the receiver at Garber Research Center, requested two 55-gallon drums of 98% magnesium hydrate from Mr. Al Pack at the Ludington Works. The notation on the letter indicates

that the shipment received was contaminated and tossed away. (PT 39.)

62) Mr. Davies, in his testimony at the trial, confirmed the fact that the material received was contaminated and that the hydrate was not used in the initial phase of the investigation. (R. 769.)

63) He further testified that, since they did not have the hydrate, he instructed Mr. Havranek to add some sodium carbonate to the brick mix to see if that would reduce the $B_2O_3$ content. (R. 769.)

64) Page 18 of Mr. Havranek's notebook indicates that he prepared a batch of 77 pounds of Ludington hydrate on June 3, 1963, but there is no indication that he added any sodium carbonate to it. (Birch Exhibit KD, p. 18.)

65) The notebook further indicates that he made up two other mixes from regular 31–62 grain and to one of those batches he added .5% sodium carbonate and to the other he added 1.0% sodium carbonate. (Birch Exhibit, KD, p. 18.)

66) He further indicated that the "object of sodium carbonate addition is to volatilize $B_2O_3$ as borax during burn." (Birch Exhibit KD, p. 18.)

67) On June 19, 1963, Mr. Havranek prepared three mixes of Ludington 98 grade hydrate to which he added 1.0% of sodium fluoride, sodium chloride or sodium carbonate. Mr. Havranek indicated that the object of the experiment was "to see if these salts will form volatile compounds with $B_2O_3$ during burning and thus reduce $B_2O_3$ content." (Birch Exhibit KD, p. 18.)

68) The Ludington 98 grade hydrate which Mr. Havranek used on June 19, 1963, was from Lot No. 1120, manufactured on March 31, 1963, by Dow Chemical. This hydrate was from the same lot as that used in the study conducted under Laboratory No. B 7870, which the inventors had had conducted between June 10, 1963, and June 13, 1963. (PT 81; Birch Exhibit KD, p. 18.)

69) On August 2, 1963, Mr. Havranek received the results of the effect of the addition of sodium carbonate to the 7–63 brick-making batch. (Birch Exhibit KD, p. 13; PT 39.) Mr. Havranek received this analysis approximately 15 days after the priority of the project had been elevated to Class II+ on July 18, 1963.[4] (PT 39.)

70) There is no indication in PT 39 that any *brick* were made from the *Ludington 98 grade hydrate* to which Mr. Havranek had added sodium fluoride, sodium chloride and sodium carbonate in his attempt to determine the most effective method of removing $B_2O_3$.

71) The addition of sodium carbonate to the brickmaking batches, on the other hand, reduced the $B_2O_3$ content from 0.10% to 0.075% when 0.5% sodium carbonate was added, and from 0.10% to 0.063% when 1.0% sodium carbonate was added. Hot strength, as measured by modulus of rupture at 2300° F, increased approximately 18% as a result of the reduction of the $B_2O_3$ content. (PT 39.)

72) The Court concludes that as of August 9, 1963, plaintiff had made no magnesite brick from its 98 grade magnesium hydrate which had a $B_2O_3$ content of less than 0.05%.

73) The Court further finds that the recollection of Mr. Davies at trial in regard to sequence of events relating to the experimental work done in PT 39 is not supported by the record. (R. 765–771.)

74) The Court further finds that there is no evidence whatsoever in the record *on or prior to May 28, 1963,* to support the statements in the "Invention Record" (PT 34) that a $B_2O_3$ content below 0.05% would pro-

4. It should be noted that it took plaintiff much longer to complete the analysis of this Class II (eventually Class II+) project than it took plaintiff to complete the analysis of either the Scalistiri samples (Finding of Fact No. 47, *supra*) or the used Anker T fragment (Finding of Fact No. 48, *supra*), both of which Mr. Davies attempted to pass off at trial as being non-priority investigations. Consequently, the Court places very little credence in that testimony appearing at pp. 459–460, 766–768 of the transcript of the trial which attempts to downgrade the investigation efforts of plaintiff in regard to those materials.

duce a high hot strength magnesite brick other than the data compiled from plaintiff's studies of the five samples of Scalistiri Grecian magnesite, and its analysis of the used fragment of the Anker T brick.[5]

75) The Court further finds that there is no evidence whatsoever in the record prior to May 28, 1963, that indicates that any magnesite brick with a modulus of rupture at 2300° F in excess of 2000 psi had ever been *produced* by plaintiff's laboratory or *tested* by it. The only information in the record relating to a high purity magnesite brick with a modulus of rupture in excess of 2000 psi prior to May 28, 1963, was the statement made by Doctor Gilpin to the inventors on or about March 31, 1963, or April 1, 1963, that he had, by using Grecian magnesite, been able to make brick with a modulus of rupture at 2300° F which approximated the purported 3000 psi modulus of rupture of Anker T.

76) The Court further finds that the inventors, as of May 28, 1963, concluded, as a result of their studies of brick made from the 31–62 grain from the Ludington Works which had an abnormally high $B_2O_3$ content coupled with a marked decrease in hot strength at 2300° F as measured by modulus of rupture, that the low $B_2O_3$ content of Turkish magnesite (0.03%) was responsible for the high hot strength of Anker T bricks.

77) The above conclusion is further supported by a report dated June 17, 1963, at a time prior to any experimentation by plaintiff with any brick with a $B_2O_3$ content of less than 0.05%, which contained the following statement:

> "To obtain improved strength of 7–63, it appears that $B_2O_3$ of 31–62 magnesite must be reduced below 0.03%. * * *

Veitsch's Anker T, which is chemically the same as 7–63, but has only 0.03% $B_2O_3$, is reputed to have very high hot strength." (PT 36.)

78) On May 22, 1963, plaintiff mailed an order to the Bureau Technique, headed by Dimitry Scalistiri, for 200 pounds of Scalistiri's Mg–967 grade magnesite. Mr. Scalistiri indicated that his firm had forwarded 2½ kilos of its Mg–1262 magnesite on May 28, 1963, by air freight, and that it had forwarded a similar sample of Mg–1285 magnesite which had a lower silica content but which was sold at a higher price. Mr. Scalistiri also informed plaintiff that the Mg–967 grade magnesite was no longer being produced by his organization. (PT 40.)

79) On June 12, 1963, plaintiff placed an order with Mr. Scalistiri for 1000 pounds of his Mg–1285 grade magnesite. (DT Q.)

80) On June 20, 1963, plaintiff placed an additional order for a 200-pound sample of Mg–1262 magnesite from Mr. Scalistiri. (PT 40.)

81) On August 19, 1963, Mr. Havranek acknowledged receipt of the Scalistiri Grecian magnesite the previous Thursday and began experimenting with the material on that date. On August 22, 1963, Mr. Havranek prepared three additional batches of the Scalistiri magnesite. The material used for Mixes B, C, D and E was Scalistiri's Mg–1285 magnesite. (PT 41.)

82) On September 10, 1963, Mr. Havranek made up an additional mix, Mix F, using Mg–1262 Scalistiri magnesite. (PT 41.)

83) Comparison brick made with plaintiff's 31–62 low boron grain (having a $B_2O_3$ content of 0.14%) were prepared by Mr.

---

5. According to plaintiff's laboratory report dated June 17, 1963, plaintiff's laboratory had an analysis of a burned *dolomite* brick made at Garber Research Center with a $B_2O_3$ content of 0.02%. This burned dolomite brick had a strength at 2300° F of 2400 psi. (PT 36.) There is, however, no evidence in the record which supports a proposition that high purity dolomite systems and high purity magnesite systems respond in a *straight-line relationship* to minute changes in the percentage by weight of the minor impurities. In fact, plaintiff's experience with magnesite-chrome systems, embodied in Exhibit PT 32, precludes the Court from drawing any such inference in the absence of evidence indicating such a relationship. (R. 296–298.) The chemical composition of high purity dolomite and high purity magnesite differs greatly. (See PT 30, column 3, lines 30–40. See also the footnote to Finding of Fact No. 101.)

Havranek on August 19, 1963. The $B_2O_3$ content of the samples of Grecian magnesite ranged from 0.01% to 0.02%, and it is clear from the record that the brick made from the Scalistiri Grecian magnesite, detailed in the report dated October 16, 1963, were the first *brick* made by plaintiff having a $B_2O_3$ content of less than 0.05%. (PT 40.)

84) Brick made from Scalistiri's Mg–1285 magnesite (Mix B) had a modulus of rupture at 2300° F of 1060 psi. Brick manufactured from plaintiff's 31–62 grain (Mix A) had a modulus of rupture at 2300° F of 1190 psi. Brick manufactured from Scalistiri's Mg–1262 magnesite (Mix F) had a modulus of rupture at 2300° F of 1400 psi. (PT 40.)

85) The same report further indicates that the brick manufactured from plaintiff's 31–62 grain (Mix A, H–W 7–63) failed a load test at 2500° F after 12 minutes under a load of 250 psi. None of the brick made from the two samples of Scalistiri Grecian magnesite failed the hot load test at that temperature.[6]

86) The brick made from plaintiff's 31–62 grain, covered in Laboratory Report No. B 7866, dated August 9, 1963, to which Mr. Havranek added sodium carbonate to reduce the amount of $B_2O_3$ had a modulus of rupture at 2300° F of 1540 psi, but no tests were conducted on the brick at temperatures in excess of 2300° F. (PT 39.)

87) Prior to September 5, 1963, plaintiff's laboratory received two unused Anker T bricks which had been made by Veitsch for service in the Kaldo vessel in Domnarvet, Sweden. The brick had a $B_2O_3$ content of 0.02% and had a modulus of rupture at 2300° F of 1160 psi and a modulus of rupture at 2500° F of 800 psi. The same report indicates that the inventors concluded that the brick which they had already made from the Mg–1285 Scalistiri magnesite (Mix B) had properties similar to the Anker T

received from Domnarvet. The inventors further concluded that the Grecian and Turkish magnesites were similar and, as a result thereof, they further concluded that Veitsch was not using any "special manufacturing technique to make Anker-T." (PT 42.)

88) From the above it is clear that there is no basis in the record to support Mr. Davies' statements at the trial that the Scalistiri magnesite was ordered as a result of experiments involving low $B_2O_3$ magnesites in the range of 0.05%. (R. 615, 620 and 755.)

89) The Court concludes that the samples of Scalistiri Grecian magnesite were ordered by plaintiff for the following reasons:

a. The inventors' knowledge that the *increased* $B_2O_3$ content of plaintiff's 31–62 grain manufactured in December of 1962 reduced its hot strength as measured by modulus of rupture at 2300° F;

b. The knowledge of plaintiff and the inventors of the reputed hot strength of Anker T brick being used in Europe;

c. The information revealed to the inventors by Doctor Gilpin in regard to making a brick comparable to the Anker T brick by using Grecian magnesite;

d. The low $B_2O_3$ analysis of the used fragment of the Anker T brick which plaintiff had received from its Swedish agent; and

e. The low $B_2O_3$ analysis of the five samples of Scalistiri magnesite which plaintiff had received in January of 1963.

90) Mr. Davies testified at trial that the Invention Record (PT 34), dated May 28, 1963, was the embodiment of what later became designated as Claim 10 of the patent in suit. (R. 237–238.)

91) Mr. Davies further testified (R. 236–237) that his concept of Claim 10 came to him sometime in February or March of

---

6. Subsequent testing of brick made from Mix B of the Mg–1285 Scalistiri magnesite failed a hot load test at 2800° F after seven hours; brick made from Mix F from the Mg–1262 Scalistiri magnesite failed the load test at 2800° F after seven minutes. These latter tests were conducted by Dravo with a load of 500 psi. (PT 40.)

1963. Mr. Davies relied on the information contained in PT 33 as the basis for the statement contained in the Invention Record, but the Court concludes that Mr. Davies' reliance is misplaced in view of the fact that nothing in the document relates to $B_2O_3$ content of less than 0.05%. Furthermore, according to the Invention Record, the concept was limited to systems with a lime to silica ratio between 3:1 and 4:1. The declaration of the critical limitation of 0.05% $B_2O_3$ lacked any experimental support, and the Court finds that it was merely an extrapolation of the results obtained by plaintiff's laboratory from the analysis of the fragment of Anker T brick having a $B_2O_3$ content of 0.03% and the analyses of the $B_2O_3$ content of the five samples of Grecian magnesite which had been available to plaintiff since January of 1963, and which were analyzed as a direct result of the inventors' conversations with Doctor Gilpin. The inventors had merely concluded that the *reason* for the hot strength of the Anker T brick and of the brick made from Grecian magnesite by Doctor Gilpin was the low $B_2O_3$ content. The inventors, however, reached this conclusion in regard to the effect of the $B_2O_3$ content as a result of their own insight since it is clear that Doctor Gilpin was unaware of any significance to be attributed to the $B_2O_3$ *content* of the materials which he had discussed with the inventors on March 31st or April 1st of 1963.

92) There is no evidence in the record to indicate that any Anker T brick either had or has ever been manufactured in the United States by Veitsch, and defendant admitted in Request for Admission No. 9 that it was unaware of "any evidence indicating than an Anker T brick has ever been made in the United States by Veitsch." (PT 6.)

93) Aside from the experimental brick made by plaintiff from the two shipments of Scalistiri Grecian magnesite, there is no evidence in the record which indicates that a brick composed solely from Scalistiri magnesite was commercially manufactured by anyone in the United States prior to about August of 1966. (PT 6, No. 9(b).)

94) In late May and early June of 1963, at a time prior to any of plaintiff's experiments which related to the *reduction* in $B_2O_3$ content below the 0.10% to 0.14% which plaintiff normally encountered in its 31–62 grain that was manufactured from its 98 grade magnesium hydrate which it received from Dow Chemical (See PT 39, Work Order dated June 3, 1963), plaintiff began a search for a low $B_2O_3$ source material. Its first step in that direction was to place an order for a 200-pound sample of Scalistiri's Mg-967 grade magnesite on May 22, 1963. (PT 40.)

95) A document, dated June 11, 1963, bearing the caption "H–W Mg (OH)$_2$," was introduced into evidence at trial to indicate one of the first steps by plaintiff in the attempt to obtain a low boron slurry from Dow Chemical. (R. 363.) The Court makes the following conclusion in regard to that document:

a. The first page of the document relates to a conversation which the author had with Mr. Earl Leatham (spelled "Lethem" in the document), most probably by telephone on the date indicated, relating to problems which plaintiff was having with its refractories for BOF furnaces, i. e., the 78–62 and 7–63 refractories;

b. Mr. Leatham informed the author that plaintiff had previously made an outstanding product but that that product had lost its outstanding property;

c. Mr. Leatham informed the author of the results of some of plaintiff's research in regard to the $B_2O_3$ content of the calcined Dow material made by Dow from March 31, 1963, through May 11, 1963;

d. With the exception of the analysis shown for April 26, 1963, the four remaining analyses correspond to those contained in a Laboratory Report dated June 13, 1963, the Work Order for which was issued on June 10, 1963, and that study related to plaintiff's effort to determine the source of the excess $B_2O_3$ content of the 31–62 grain which had been produced

at Ludington in *December of 1962* (PT 81);

e. Mr. Leatham indicated that plaintiff was interested in obtaining a 200-pound sample of magnesium hydrate with a low $B_2O_3$ content;

f. Mr. Leatham indicated to the author that plaintiff was not sure that $B_2O_3$ was the cause of its problem;

g. The author further indicated that Dow had no ready source of low $B_2O_3$ magnesium hydrate, but he indicated that it would take two days to make 200 pounds thereof at a cost of approximately $1500. (PT 203.)

96) The Court refuses to draw any inference from the testimony adduced at trial from Mr. Davies in regard to the $B_2O_3$ content of Dow's magnesium hydrate, as reflected in PT 203, that the information therein related to any studies conducted by plaintiff for any purpose other than to determine the source of the abnormal 0.30% $B_2O_3$ content of its 31–62 grain that had been manufactured in December of 1962.[7]

97) There is no testimony or document in the record to indicate that Dow Chemical ever provided the 200-pound sample of its magnesium hydrate which was discussed in PT 203, even though it would have only taken two days to prepare such a sample at a cost of $1500.

98) Additional efforts by plaintiff to find a raw material of low $B_2O_3$ content included the following:

a. *Israeli Magnesite*

1. At a time subsequent to August 2, 1963, when Mr. Havranek received the reports of the analysis reported under B 7866 (Birch Exhibit KD, p. 13), Mr. Havranek, under a study designated B 7910, began a study of Israeli magnesite. His report indicated that at the time he began the experiment the only "successful

method of increasing hot strength *to date*" was by increasing the lime/silica ratio to greater than 3:1. The aim of the study was to produce "+99% MgO brick from Israeli magnesite with special emphasis on hot strength." Using the techniques detailed under B 7866 Mr. Havranek added 1% sodium carbonate to the Israeli hydrate prior to the time it was dobied at 8000 psi and caustic burned at 1800° F. The material then was to be redobied and burned at 3140° F, and Mr. Havranek anticipated that the boron should "volatilize as borax in either one of the burns." Mr. Havranek indicated that the boron content was checked after the caustic burning and it was "still all there." After further treatment and pressing, the material, when burned at 3140° F, lost most of its $B_2O_3$ content. Burned brick made from this material had a modulus of rupture at 2300° F that was about four times that of plaintiff's Harklase brick, and Mr. Havranek noted that the "most significant improvement in this brick over lower porosity harklase was the increase in hot strength." Mr. Havranek further indicated that "(s)ome Israeli caustic MgO were sent to Ludington for briquetting." (Birch Exhibit KD, p. 17.) (*Emphasis added.*)

2. Mr. Havranek requested the briquetting of the high purity Israeli magnesite on September 23, 1963, in a letter to Mr. Good at the Ludington Works. By a letter dated September 26, 1963, Mr. Good indicated that Mr. Havranek's timing was perfect since the plant's shop kiln would be down for repairs for the next few weeks. By a letter dated October 18, 1963, Mr. Havranek indicated that he was forwarding two drums containing approximately 500 pounds of caustic burned Israeli magnesite for briquetting. By a letter dated November 15, 1963, Mr. Good indicated that he had finally managed to

---

7. To the following question, "Do you know what, if anything (sic) Harbison-Walker was doing those months with respect to ascertaining $B_2O_3$ contents?", Mr. Davies responded, "Well, we were consistently measuring, yes. We were the investigators during those periods." (R. 365.) The exchange lends no credence to plaintiff's argument that plaintiff had been working with any low $B_2O_3$ materials of less than 0.05% $B_2O_3$ at any time prior to June 11, 1963.

briquette the material which Mr. Havranek had sent to him. The laboratory Report dated March 26, 1964, indicated that the burned brick made from this briquetted material had a hot modulus of rupture at 2300° F of 1550 psi and a modulus of rupture at 2600° F of 740 psi. Mr. Havranek further indicated that this represented "a tenfold increase in hot strength compared with Harklase which is made from 98 grade magnesite." (PT 138.)

b. *Alcan Q–20*

1. The inventors began experimenting with Alcan Q–20 magnesite, a low $B_2O_3$ material (0.02%), in early November of 1963. (PT 44.)

2. Plaintiff's Laboratory Report, dated January 7, 1964, indicated that brick made with Alcan Q–20 magnesite were superior to the H–W 7–63 brick, although the Alcan Q–20 magnesite contained a high amount of iron oxide (1.2%). Mr. Havranek considered this result surprising in view of the fact that a study conducted under Laboratory No. B 7728 indicated that an addition of iron oxide sharply reduced hot strength. The report further indicated that "In lime/silica ratio and boron content (the Alcan Q–20) is similar to Anker–T made by Veitscher for Kaldo vessels." (The lime/silica ratio of the Alcan Q–20 magnesite was 2.3:1.) The report also contained the following statement: "Even with Grecian magnesite of equivalent density in Study B 7922 (PT 40) we were unable to equal these strength properties." The report further indicated that an attempt would be made to duplicate the Alcan Q–20 magnesite from Dow hydrate under Laboratory No. B 7989. Despite the apparent success of the brick at 2300° F and the obvious

optimism contained in the laboratory report, a notation by Mr. Davies on a letter dated March 2, 1964, indicated that the brick were not satisfactory for the Dravo tests for the Kaldo vessel at Sharon Steel. The fact that the brick failed a load test of 250 psi at 2540° F on or about March 6, 1964, undoubtedly prompted Mr. Davies' notation (PT 45, p. 6). (PT 43.)

3. Prior to April 1, 1964, the inventors conducted further experiments with Alcan Q–20 magnesite. The study, reported under Laboratory No. B 8006, was a three-phase project. The first phase involved a study of the effects of the lime/silica ratio over a range of 1:1 to 3.2:1. The second phase was a study of the effect of an increasing $B_2O_3$ content in a system with a relatively constant lime/silica ratio. The first two phases were conducted using Alcan Q–20 magnesium hydrate. The final phase merely involved the preparation of brick from regular Alcan Q–20 magnesite which had been burned in a rotary kiln at Canadian Refractories Limited. At 2300° F all the brick prepared from the Alcan Q–20 had a modulus of rupture at 2300° F in excess of 1000 psi with the exception of the brick containing 0.15% $B_2O_3$, which had a modulus of rupture of 470 psi at 2300° F. However, at 2600° F, none of the brick made from the Alcan Q–20 had a modulus of rupture in excess of 440 psi. The report, however, did indicate the significance of low $B_2O_3$ content.[8] (PT 47.)

4. A study begun on March 11, 1964, the aim of which was "to reduce boron content of synthetic magnesites by dilution with low-boron natural magnesites," included the use of Alcan Q–20 magnesite in combination with plaintiff's 98 grade magnesite, as well as additional mixtures

---

**8.** Although the brick made from the Alcan Q–20 magnesite performed admirably at 2300° F, it came nowhere near approaching the performance of the Anker T as reported under Laboratory No. P 2009 (PT 160) which had a modulus of rupture at 2600° F of 1160 or 1170 psi (*Cf.* PT 160, p. 2; PT 47, p. 4). (Although

the laboratory report dealing with plaintiff's analysis of the Anker T 15 brick which it received from Sharon Steel bears a date of April 17, 1964, it is clear from PT 47 that an analysis of the Anker T 15 brick had been made prior to April 1, 1964, and that both the inventors were aware of that analysis.)

using Chewelah[9] clinker, Grecian magnesite, and plaintiff's 98 grade magnesite in varying percentages. The results confirmed previous research in regard to the adverse effect of increasing $B_2O_3$ contents, and they indicated an interrelationship in the lime/silica ratio, $R_2O_3$ content and $B_2O_3$ content. (PT 50.)

c. *Low $B_2O_3$ Magnesite Made from Dow's Hydrate*

1. PT 203, dated June 11, 1963, is the earliest document reflecting plaintiff's expressing an interest in a low $B_2O_3$ magnesium hydrate from Dow.

2. The inventors first reduced the $B_2O_3$ content of plaintiff's 31–62 grain (made from the Dow magnesium hydrate) from the normal range of 0.10%—0.14% to 0.075% and 0.63% by adding .5% and 1% respectively of sodium carbonate to the 7–63 brickmaking batch sometime in July, 1963. (PT 39; Birch Exhibit KD, pp. 13, 18.)

3. PT 205 indicates that plaintiff next approached Dow on December 4, 1963, in regard to obtaining a low $B_2O_3$ magnesium hydrate containing less than 0.07% $B_2O_3$ on a dead burned basis.

4. PT 206 indicates that plaintiff next contacted Dow in regard to a reduction of the $B_2O_3$ content of its magnesium hydrate on January 15, 1964. At that time plaintiff expressed an interest in receiving material from Dow which contained no more than 0.02% $B_2O_3$ on a dead burned basis.

5. PT 208 indicates that on April 8, 1964, representatives of plaintiff called upon representatives of Dow, and they were informed that Dow had completed an investigation into methods of reducing the $B_2O_3$ content of their product approximately 50% from 0.12%—0.14% to between 0.06%—0.08%. The document further indicates that plaintiff again con-

tacted Dow on or about April 13, 1964, to emphasize their desire to have a product with a $B_2O_3$ content in the range of 0.02%—0.05%.

6. PT 51 indicates that between March 31 and July 27, 1964, the inventors successfully reduced the $B_2O_3$ content of various grades of magnesite which it manufactured from the Dow magnesium hydrate. It is clear from the report that Dow did not manufacture the low boron material used in the study.

7. PT 52 indicates that sometime between June 23 and August 24, 1964, the inventors prepared brick at Garber Research Center using low boron 31–62 grain and 98 grade magnesite grains which ranged from 0.041%—0.09% $B_2O_3$. It is clear from the report that Dow did not manufacture the low boron material.

8. PT 209, dated June 30, 1964, indicates that Dow was prepared to make a low $B_2O_3$ product for plaintiff in the near future.

9. PT 55, dated September 8, 1964, indicates that approximately 600 tons of special low boron 98 grade magnesite was produced by plaintiff at Ludington from the Dow magnesium hydrate. The $B_2O_3$ content of this dead burned magnesite was 0.048%. The hot strength as measured by modulus of rupture at both 2300° F and 2600° F of plaintiff's Harklase brick made from this low boron magnesite increased tremendously.

10. PT 57, dated November 19, 1964, indicates that a portion of the 600 tons of the low boron 98 grade magnesite produced at Ludington was converted to 31–62 grain. H–W 7–63 brick made from this low boron 31–62 A grain was not superior to similar brick made from the regular 31–62 grain. Nonetheless, plaintiff's Oxiline B brick (plaintiff's 78–62 refractory), which were made from this low boron

---

**9.** A study conducted by plaintiff under Laboratory No. B 8010 to investigate the advantages of Chewelah clinker, which had a $B_2O_3$ content of 0.02%, indicated that the brick made from that material had a modulus of rupture at 2300° F of 70 psi, and its modulus of rupture at

2600° F was 0. The high iron oxide (4.7%) of this clinker was the probable cause of the rapid decline in its hot strength. (PT 50, column 1 of the condensed laboratory data; PT 50, p. 3; PT 43, p. 1.)

31–62 A grain at plaintiff's Windham Works, were installed in the BOF at National Steel, Great Lakes, and the lining set a new record of 528 "heats" for that shop.

99) As Mr. Davies stated at trial, plaintiff was interested in a low boron magnesium hydrate from Dow because there was no satisfactory *natural* magnesite available in this country. (R. 750–751.)

100) Other factors considered important by plaintiff in selecting raw material for its magnesite brick were:

    a. The chemical composition and uniformity of the product;

    b. Assurance of adequate continuing supply; and

    c. The price. (R. 73–74.)

101) The initial application covering matters which ultimately resulted in the patent in suit (Serial No. 349,736), filed March 5, 1964, related primarily to methods of removing or reducing the $B_2O_3$ content of dead burned magnesia to a level below 0.05%. Though that application was later abandoned, it contained a recitation which reads squarely upon the statements contained in the Invention Record. The recitation included the statement that: "The brick had a modulus of rupture at 2300° F which was in excess of 2000 psi." (DT EP, pp. 4–5.) As indicated in Finding of Fact No. 75, there is no evidence in the record prior to May 28, 1963, which indicates that any magnesite brick with a modulus of rupture at 2300° F in excess of 2000 pounds had ever been produced or tested in plaintiff's laboratory. The Court finds that that recitation was false.[10]

102) The initial application recited a method of removing boron from commercial dead burned magnesite grain by making an addition of sodium carbonate to the brick-making batch. (DT EP, p. 2, lines 17–29; p. 3, lines 1 & 2.)

103) The method, mentioned immediately above, was carried forward into the patent in suit as Example 18. (PT 1, column 7, lines 25–40.)

104) The Court has been unable to find any document dated prior to March 5, 1964, the filing date of the initial application, which illustrates a reduction in the $B_2O_3$ content of commercial dead burned magnesite from 0.14% to *0.03%*.

    a. PT 39, dated August 9, 1963, and bearing the Laboratory No. B 7866, contains the results of the inventors' first attempt to remove $B_2O_3$ from commercial dead burned magnesite, but the report indicates that the $B_2O_3$ content was reduced from 0.10% to *0.063%*, as opposed to the recitation in the first application and the patent indicating a reduction from 0.14% to *0.03%* $B_2O_3$. Additionally, the burn temperature indicated in PT 39 was 2900° F as compared to the temperature of 3050° F recited in the application and patent.

    b. PT 138, which covers work done in a period from sometime in August or September of 1963 until March 26, 1964, indicates that the inventors successfully reduced the $B_2O_3$ content of Israeli magnesite from 0.15% to *less than 0.01%* by making an addition of 1% sodium carbonate to the magnesite and burning it at a temperature of 3140° F. However, the Israeli magnesite was *99.6%* MgO as com-

---

**10.** This conclusion is further buttressed by the statement contained in the abstract of PT 43 which indicates that not only was the bulk density of Alcan Q–20 magnesite higher than that ever experienced before by plaintiff for a magnesite brick, but in addition, the modulus of rupture at 2300° F of *1880* psi was "also *unsurpassed* in previous experience on *magnesite brick*." (*Emphasis added.*) This document bears the date of January 7, *1964*. The highest modulus of rupture at 2300° F which the Court has been able to find for the period prior to June of 1964 is 1960 psi contained in Mix I (100% Austrian magnesite, non-impregnated), PT 54. The source document for that data presumably is PT 50 (although no Mix R appears in the exhibit nor does any reference to Austrian magnesite appear in the laboratory report), and that study began on March 11, 1964, i. e., after the filing of the initial application, and ended on June 8, 1964.

pared to the recitation in the initial application of *96% MgO*.

. c. Page 17 of Mr. Havranek's notebook (Birch Exhibit KD) refers to the study conducted under Laboratory No. B 7866 (PT 39) as the basis for the technique of adding sodium carbonate to reduce the $B_2O_3$ content.

d. PT 51, which covers the period from March 31 to July 27, 1964, also makes reference to the same report as the basis for the same procedure. Aside from the fact that none of the chemical analyses of the mixes detailed in PT 51 correspond to the analyses contained in the initial application and the patent in terms of their chemical composition, the date of the *Work Order*, March 31, 1964, precludes this study from being the source of the recitation in the initial application.

105) The Court further finds that PT 39 was the study which provided the data upon which the recitation in the initial application, which evolved into Example 18 of the patent in suit (as indicated in Finding of Fact No. 103 above) was predicated. As such, the information contained in the initial application is false and misleading for the following reasons:

a. The $B_2O_3$ content of the brick was not reduced below 0.03% (which would have been below the critical figure of 0.05%), but, at best, it was reduced to 0.063%.

b. Research conducted by the inventors subsequent to the filing of the initial application but prior to the filing of the application which resulted in the patent in suit indicated that the technique was unsuccessful in removing the $B_2O_3$ from plaintiff's 31–62 grain except in small scale studies. Plaintiff's 31–62 grain clearly had a chemical composition falling within the chemical limitations detailed in Example 18. (PT 51.)

106) The initial application also recited a method of reducing $B_2O_3$ content by making additions of sodium chloride, sodium fluor-ide and sodium carbonate to magnesium *hydrate*. (DT EP, p. 3, lines 3–14.)

107) A comparison of the chemical data obtained in the above recitation and that contained on page 3 of PT 39 indicates that PT 39 served as the basis for the recitation. (The Court also relies upon the statement contained under the date 6/19/63 on page 18 of Birch Exhibit KD, as well as plaintiff's answer to Basic's Interrogatory No. 102.)

108) Example 19 of the patent in suit corresponds to the above recitation in the initial application except for the statement contained therein that the additions were made to "*dead burned magnesite*" as opposed to the earlier recitation which indicated that the additions were made to batches of "magnesium *hydrate*." (PT 1, column 7, lines 41–52.)

109) Although there are three documents in this case which indicate an addition of sodium *carbonate* to reduce the $B_2O_3$ content of *dead burned magnesite* (PT 39, PT 138, and PT 51), there is no evidence whatsoever which indicates that either sodium *chloride* or sodium *fluoride* were added to *dead burned magnesite* to reduce the $B_2O_3$ content. The Court therefore concludes that the representation made by Example 19 of the patent was false.

110) The source of the data for TABLE IV (Example I) of the Third Application (DT ER, p. 8) was Mix B in PT 216. TABLE IV (Example I) of the Third Application became Example 1 of the patent in suit, and the Court finds that the data set forth in Example 1 of the patent in suit is clearly supported by the data in the record.

111) The source of the data for TABLE V (Example II) of the Third Application (DT ER, pp. 8–9) was Mix G of PT 216. TABLE V (Example II) of the Third Application became Example 2 of the patent in suit, and the Court finds that the data set forth in Example 2 of the patent in suit is supported by the data in the record.

112) The Court, however, further finds that the data contained in Example 2 of the patent in misleading in that the modulus of

rupture at 2600° F, which is not reported in either the Third Application or the patent itself, was 125 psi as reported in PT 216. The Court finds the example misleading because of the representation made in column 7, lines 7–22 of the patent in suit, that brick made within the teachings of the patent have a "good" modulus of rupture as defined implicitly by Table 4 of the patent as being <u>210</u> psi at the lowest and the representation made by Mr. William C. Nealon at page 35 of the Fourth Application (PT 2).

113) The source of the data for Example III of TABLE VI of the Third Application (DT ER, p. 9) was Mix G of PT 47. Example III of TABLE VI became Example 3 of the patent in suit, and the Court finds that the data set forth in Example 3 of the patent in suit is clearly supported by the data in the record.

114) The source of the data for Example IV of TABLE VI of the Third Application (DT ER, p. 9) was Mix C2 of PT 61. Example IV of TABLE VI became Example 4 of the patent in suit, and the Court finds that the data set forth in Example 4 of the patent in suit is not supported by the record.

115) The following table, TABLE A, compares the analyses set forth in Mix C2 of PT 61, Example IV of the Third Application and Example 4 of the patent in suit.

### TABLE A

| | MIX C2 (PT 61) | Ex. IV (2d App) | Ex. 4 (Patent) |
|---|---|---|---|
| Silica ($SiO_2$) | 1.9 | 1.9 | 1.9 |
| Alumina ($Al_2O_3$) | 0.5 | 0.5 | 0.5 |
| Iron Oxide ($Fe_2O_3$) | 0.3 | 0.3 | 0.3 |
| Lime (CaO) | 5.5 | 5.0 | 5.0 |
| Boron ($B_2O_3$) | 0.56 | 0.56 | 0.56 |
| Magnesia (MgO) | 91.2 | Difference | Difference |
| Lime/Silica Ratio | 2.9:1 | 2.5:1 | 2.5:1 |
| $\dfrac{(C \div S)^2}{100\%}$ | 0.55* | | 0.47** |
| Modulus of Rupture at 2300° F | 680 | 600*** | 600 |

*Actual calculation comes out to 0.5476.

**Actual calculation comes out to 0.4761, which, when rounded off, should be 0.48.

***As indicated in TABLE VIII.

---

116) It is clear from the above comparison that the lime (CaO) content indicated in Example IV of the Second Application and Example 4 of the patent in suit is misstated

by 0.5%. This misstatement is responsible for the reduction of the lime/silica (C/S) ratio from 2.9:1 to 2.5:1. Additionally, and more importantly, it reduces the quantity of $B_2O_3$ permitted by the $\frac{(C+S)^2}{100\%}$ formula from 0.55% to 0.47%. The brick made from Mix C2 of PT 61 contains a $B_2O_3$ content that is 0.01% in excess of that permitted by the formula, but it nonetheless had a modulus of rupture at 2300° F of 680 psi. Example 4 of the patent in suit indicates that its $B_2O_3$ content is 0.09% in excess of that permitted by the formula, and in addition, represents its modulus of rupture at 2300° F as being 600 psi. The Court therefore concludes that the data contained in Example 4 of the patent in suit is false and misleading.

117) Example V and Example VI of the Third Application, page 10, lines 2–10, became respectively Example 5 and Example 6 of the patent in suit. Plaintiff was unable to locate any documents to support either of the examples. (DT HB, No. 88 and No. 89.) In addition to that, however, Example 6 may or may not fit within the scope of the claims of the patent in suit. It does not fall within the scope of Claims 1, 3, 4, 6, 7, 8, 9, or 15 because the CaO to $SiO_2$ weight ratio being in excess of 3:1. It does not fall within the scope of Claims 2 or 5 because those claims require *more* than 1% $SiO_2$ and Example 6 contains only 1% $SiO_2$. It does not fall within the scope of Claim 10 because its $B_2O_3$ content of 0.15% is in excess of the "essentially less than 0.05% $B_2O_3$" requirement of Claim 10. It falls within the scope of Claims 11–14 if, but only if, one interprets "*greater* than *about* 1%" $SiO_2$ to include 1%.

Even assuming that 1% is "greater than about 1%", the problem that still exists is that the chemical composition of Example 6, if practiced under Claim 14 of the patent in suit, clearly falls within the scope of Claims 5 and 6 of plaintiff's U. S. Patent No. 3,141,790 if one is consistent in interpreting the meaning of the word "about" as used in the "greater than" and "no more than" context in which it appears in those claims.

118) The Second Application, Serial No. 393,207, filed on July 16, 1964, related primarily to magnesite refractory brick suitable for use in basic oxygen furnaces. The application was limited to refractories containing "at least 95% MgO" in which the lime/silica ratio was essentially less than 3:1. (DT EQ, pp. 1–7.)

119) TABLE I on page 8 of the Second Application sets forth the results of tests on five different refractories having varying chemical compositions. TABLE I of the Second Application was carried forward into the patent in suit and became Table 2 in the patent. All the data contained in TABLE I came from PT 51. The following table sets forth the data compiled from all three exhibits and the footnotes thereto point out any discrepancies. From TABLE B contained on page 40 of this Opinion, it is clear that at least six "mistakes" occurred in transcribing the data from PT 51 to Table 2 of the patent in suit. While carelessness may explain five of the "mistakes" noted in the footnotes to TABLE B, and possibly excuse them, the representation that the brick of Example 11 of the patent in suit did not fail the load test at 2700° F, whereas, in fact, it failed after *one* hour, is downright misleading.

See Table B on next page.

## TABLE B

| | Typical Data* Harklase (PT 51) | MIX I (PT 51) | MIX J (PT 51) | MIX K (PT 51) | MIX L (PT 51) |
|---|---|---|---|---|---|
| | MIX A (2d App) | MIX B (2d App) | MIX C (2d App) | MIX D (2d App) | MIX E (2d App) |
| | Eg. 7 (Patent) | Eg. 8 (Patent) | Eg. 9 (Patent) | Eg. 10 (Patent) | Eg. 11 (Patent) |
| Silica ($SiO_2$) | 0.8* | 0.7 | 0.8 | 0.7 | 0.7 |
| Alumina ($Al_2O_3$) | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 |
| Iron Oxide ($Fe_2O_3$) | 0.3 | 0.3 | 0.2 | 0.3 | 0.2 |
| Lime (CaO) | 1.1 | 1.2 | 1.1 | 1.1 | 1.1 |
| Boron ($B_2O_3$) | 0.13* | 0.094 | 0.072 | 0.05 | 0.025 |
| Magnesia (MgO) | ** | ** | ** | ** | ** |
| Lime/Silica Ratio | 1.4:1* | 1.7:1 | 1.4:1 | 1.6:1 | 1.6:1 |
| Modulus of Rupture at 2300° F (psi) | (150)*** | (290)*** | (420)*** | (660)*** | (1100)*** |
| Modulus of Rupture** at 2600° F (psi) | 50 | 80 | 90 | 140 | 850 |
| Load Test, 250 psi Temp. of Failure (°F) | 2300 | 2400*** | 2420*** | 2560 | No Failure at 2700° F*** |

*DT HB, No. 90, indicates that the typical data for Harklase contained in PT 51 provided the basis for the data in Example 7 of the patent, even though the lime/silica ratio and $B_2O_3$ data vary minutely, i.e., $SiO_2$=0.9, $B_2O_3$=0.11, and C/S ratio=1.2:1 as listed in PT 51.

** The difference.

***The figures in parentheses are the actual figures for the modulus of rupture at 2300° F given in PT 51.

**These figures are the actual figures for the modulus of rupture at 2600° F given in PT 51, not 2300° F as indicated in the patent, nor 2700° F as indicated in the Second Application.

***PT 51 indicates that MIX L failed the 250 psi load test after one hour at 2700° F.

***Actual figure given in PT 51 is 2410° F for both.

172

120) TABLE II, on page 9 of the Second Application, sets forth the same data contained in Table 3 in column 6 of the patent. PT 51 is also the source for the data contained in TABLE II of the Second Application. The following table, TABLE C, combines the data from the three documents and the footnotes point out the discrepancies.

## TABLE C

| | Typical Data H-W Mag. — C Grade (PT 51) | MIX M (PT 51) |
|---|---|---|
| | MIX F (2d App) | MIX G (2d App) |
| | Eg. 12 (Patent) | Eg. 13 (Patent) |
| Silica (SiO$_2$) | 2.8 | 2.3 |
| Alumina (Al$_2$O$_3$) | 0.3 | 0.3 |
| Iron Oxide (Fe$_2$O$_3$) | 0.6 | 0.2 |
| Lime (CaO) | 1.5 | 1.5 |
| Boron (B$_2$O$_3$) | 0.2* | 0.015 |
| Magnesia (MgO) | ** | ** |
| Lime/Silica Ratio | 0.53:1*** | 0.65:1*** |
| Modulus of Rupture at 2300° F | 150** | 940 |
| Modulus of Rupture at 2600° F | 50** | 310 |

*Plaintiff's answer to Basic's Interrogatory No. 95 indicates that the Typical Data for H-W Magnesite, C Grade Magnesite, contained in PT ·51, was the source for Example 12 of the patent in suit. That column in PT 51 indicates that the normal range for the B$_2$O$_3$ content of C Grade Magnesite was 0.10% - 0.15%, not 0.2%. The significance of this discrepancy is discussed in Finding of Fact No. 121, below.

**The difference.

***Rounding off or averaging.

121) The data listed in PT 51 as Typical Data for H–W C Grade magnesite is probably inaccurate. The Umfrid deposition, PT 14, at pages 53 and 54 gives a range of from .16% to .22% $B_2O_3$ for the C Grade magnesite, a product made at Cape May. PT 203 contains the figures .16% to 0.17% $B_2O_3$ as representative of Cape May magnesite, and Mr. Davies testified at trial that these figures corresponded to his recollection of the $B_2O_3$ contents of the Cape May material during that period of time (R. 366). PT 162 gives a figure of 0.1% $B_2O_3$ content for Cape May *D Grade* magnesite. PT 216 gives a range from 0.16% to 0.19% $B_2O_3$ for *brick* made from magnesite manufactured at Cape May. DT FV indicates a $B_2O_3$ content of 0.18% for *42–64 grain* made at Garber Research Center from Cape May magnesium hydrate. DT FT indicates a $B_2O_3$ content of 0.17% for *brick* manufactured from *42–64 grain* made at Cape May. PT 281, dated July 30, 1964, indicates that two shipments of 42–64 grain made from the Cape May magnesium hydrate contained a $B_2O_3$ content of about 0.22%. The handwritten chemical analysis, bearing the date 7/2/64, indicated a $B_2O_3$ content of 0.21% for Mix A whereas the typed data for Mix A indicated a $B_2O_3$ content of 0.23%. The typed data for Mix A was carried forward to column 4 of the analyses shown on page 3 of PT 56.

122) The Court concludes that the data contained in Example 12 of the patent in suit is misleading for the following reasons:

a. The Second Application and the patent in suit both contained a recitation which indicated that a *specific batch* of magnesite having the chemical composition set forth in Example 12 was actually prepared and tested by the inventors. PT 51, however, clearly indicates that *Typical Data* for H–W C Grade magnesite, not an actual test sample, were included in the report;

b. The *Typical Data* included in PT 51 indicated a maximum $B_2O_3$ content of 0.15%, whereas Example 12 showed a $B_2O_3$ content of 0.2%;

c. The bulk of the exhibits discussed in Finding of Fact No. 121, above, indicate that magnesite made at Cape May had a $B_2O_3$ content of less than 0.2%, primarily in the range of 0.16% to 0.19%, although PT 281, PT 56, and Mr. Umfrid, indicated that it ranged as high as 0.22% and PT 162 indicated that it ranged as low as 0.1%;

d. Example 12 of the patent in suit contains the formula $\frac{(C+S)^2}{100\%}$ as a means of defining the maximum $B_2O_3$ content. Applying that formula to the composition of Example 12 results in a determination of the maximum $B_2O_3$ content as 0.185%. The stated $B_2O_3$ content of 0.2% would lead one to infer that the $B_2O_3$ content was responsible for the low modulus of rupture at both 2300° F and 2600° F. That inference, however, is not supported by an *assumed* $B_2O_3$ content of *0.2%* when in fact there was no measurement of the actual $B_2O_3$ content, and additional data concerning plaintiff's C Grade magnesite indicated that the $B_2O_3$ content thereof could easily have been *lower* than the maximum permissible $B_2O_3$ content as defined by the formula as being 0.185%.

123) On the basis of the Court's TABLE C, *supra*, the Court finds that the data set forth in Example 13 of the patent in suit is supported by the record.

124) Example IV of the Second Application, at page 11, lines 7–20, was carried forward and became Table 4 of the patent in suit (column 7, lines 7–19). PT 52 was the source document for three of the four examples contained therein. The following chart, TABLE D, combines the data from these three documents and any discrepancies are pointed out by the footnotes therein.

See Table D on next page.

## TABLE D

| | MIX E (PT 52) MIX H (2d App) Eg. 14 (Patent) | MIX A (PT 52) MIX I (2d App) Eg. 15 (Patent) | MIX C (PT 52) MIX J (2d App) Eg. 16 (Patent) | -- --** MIX K (2d App) Eg. 17 (Patent) | ANKER T (PT 52) |
|---|---|---|---|---|---|
| Silica ($SiO_2$) | 0.9 | 1.2 | 0.9 | 0.9 | 1.1 |
| Alumina ($Al_2O_3$) | 0.5 | 0.6* | 0.5* | 0.4 | 0.1 |
| Iron Oxide ($Fe_2O_3$) | 0.3* | 0.4* | 0.3* | 0.3 | 0.3 |
| Lime ($CaO$) | 2.1 | 2.9* | 2.0 | 2.1 | 2.7 |
| Boron ($B_2O_3$) | 0.08 | 0.067 | 0.047 | 0.015 | 0.015 |
| Magnesia ($MgO$) | **** | **** | **** | **** | **** |
| Lime/Silica Ratio | 2.3:1 | 2.4:1* | 2.2:1 | 2.3:1 | 2.3:1*** |
| **Modulus of Rupture at 2600° F psi** | 210 | 250 | 430 | 1140 | 1140***** |

*Rounded off from data in PT 52.

**Plaintiff could locate no support for this example. (DT HB, No. 100.)

***Lime/Silica ratio, using figures given in PT 52, actually comes out to 2.45:1.

****The difference.

*****The actual figure given in PT 160, the source document for the Anker T column in PT 52, for modulus of rupture at 2600° F is 1160 psi.

---

125) On the basis of the Court's TABLE D, *supra,* the Court finds that the data set forth in Examples 14, 15, and 16 of the patent in suit are supported by the record.

126) The following table, TABLE E, is a comparison of the analyses which plaintiff made of samples of Anker T to the analysis set forth in Example 17 of the patent. The analysis of Anker T which is set forth in PT 52 is *not* contained in this table.

## TABLE E

| | Eg. 17 (Patent) | Used Fragment Anker T (PT 46) | Unused Anker T from Domnarvet (PT 42) | Unused Anker T from Domnarvet as Reported in PT 46 | Unused Anker T for Sharon Steel (PT 160) |
|---|---|---|---|---|---|
| Silica ($SiO_2$) | 0.9 | 1.1 | 1.5 | 1.5 | 1.1 |
| Alumina ($Al_2O_3$) | 0.4 | 0.4 | 0.2 | 0.2 | 0.1 |
| Iron Oxide ($Fe_2O_3$) | 0.3 | 0.5 | 0.6 | 0.6 | 0.3 |
| Lime (CaO) | 2.1 | 2.9 | 3.0 | 3.0 | 2.7 |
| Boron ($B_2O_3$) | 0.015 | 0.03 | 0.02 | 0.03*** | 0.015 |
| Magnesia (mgO) | Difference | 95.1 | 94.7 | 94.7 | 95.8 |
| Lime/Silica Ratio | 2.3:1 | 2.64:1 | 2:1 | 2:1 | 2.45:1**** |
| Modulus of Rupture at 2300° F | N.I.* | N.D.** | 1160 | N.I.* | 1170 |
| Modulus of Rupture at 2500° F | N.I.* | N.D.** | 800 | N.I.* | N.D.** |
| Modulus of Rupture at 2600 F | 1140 | N.D.** | N.D.** | N.I.* | 1160 |

*Not indicated.

**Not determined.

***Typographical error in all probability.
(See R. at 666.)

****Calculated from data given in PT 160.

---

127) The following table, TABLE F, is a comparison of the data contained in Example 17 of the patent, the unused Anker T received from Sharon Steel as reflected in PT 160 and PT 52, and Mix I of PT 50, which plaintiff indicated was most closely related to Example 17 of the patent in its responses to amended Interrogatory No. 100(B) of Basic's Interrogatories (R. 646–651.)

## TABLE F

| | Eg. 17 (Patent) | Unused Anker T Sharon Steel (PT 160) | Anker T (PT 52) | MIX I 100% Grecian (PT 50) |
|---|---|---|---|---|
| Silica $(SiO_2)$ | 0.9 | 1.1 | 1.1 | 1.2 |
| Alumina $(Al_2O_3)$ | 0.4 | 0.1 | 0.1 | 0.1 |
| Iron Oxide $(Fe_2O_3)$ | 0.3 | 0.3 | 0.3 | |
| Lime $(CaO)$ | 2.1 | 2.7 | 2.7 | 2.9 |
| Boron $(B_2O_3)$ | 0.015 | 0.015 | 0.015 | 0.01 |
| Magnesia $(MgO)$ | ** | 95.8 | ** | ** |
| Lime/Silica Ratio | 2.3:1 | 2.45:1 | 2.3:1* | 2.4:1 |
| Modulus of Rupture at 2300° F | N.I.*** | 1170 | N.I.*** | 1400 |
| Modulus of Rupture at 2500° F | N.I.*** | N.D.**** | N.I.*** | N.D.**** |
| Modulus of Rupture at 2600° F | 1140 | 1160 | 1140 | 760 |

*Lime/Silica Ratio (C/S) actually calculates 2.45:1.

**The difference.

***Not indicated.

****Not determined.

---

128) The Work Order for PT 52, dated June 23, 1964, indicates that the work requested is for a patent application. The first paragraph of the Laboratory Report, dated August 24, 1964, clearly indicates that the Second Application, bearing Serial No. 383,207, was the application involved. As indicated by the table in Finding of Fact No. 124 above, Mix E of PT 52 became Mix H of the Second Application and Example 14 of the patent in suit; Mix A of PT 52 became Mix I of the Second Application and Example 15 of the patent in suit; Mix C of PT 52 became Mix J of the Second Application and Example 16 of the patent in suit.

129) On the basis of the $B_2O_3$ content of the column headed Anker T of PT 52, the erroneous calculation of the lime/silica ratio as 2.3:1 in PT 52, and the erroneous listing of the modulus of rupture at 2600° F as 1140 psi in PT 52, all of which are reflected in Example 17 of the patent in suit, the Court concludes that Example 17 of the patent in suit describes a fictitious brick, the composition of which is largely predicated upon the erroneous analysis of the Anker T brick contained in PT 52.

130) The Third Application, Serial No. 440,933, filed March 18, 1965, related primarily to the manufacture of high tensile strength magnesite refractory brick from magnesium hydroxide having a relatively high $B_2O_3$ content. Specifically, the invention related to magnesite brick having a lime/silica ratio in excess of 2:1, and defined the maximum $B_2O_3$ content in terms of the formula $\frac{(C+S)^2}{100\%}$, wherein C is the lime (CaO) and S is the silica ($SiO_2$). The lime content could range from 3% to less than 5%; the silica content had to be above 1%; the $B_2O_3$ content could be up to about 0.30%; and the remainder was to be MgO.

131) The formula of the patent in suit, $\frac{(C+S)^2}{100\%}$ appears first in this record in Laboratory Report No. B 8237, dated March 29, 1965, and bearing a Work Order dated December 21, 1964. (PT 61.)

132) At trial, in response to the following question in regard to PT 61, "Mr. Davies, this report is dated March 29, '65. You said this project started in the late fall or early '63. Was the formula derived solely from the data in this report by you and Mr. Havranek?" Mr. Davies responded, "That is absolutely correct." (R. 286.) The document itself indicated that the data contained therein in regard to the formula had been used in a patent application, and it is clear that the Third Application, Serial No. 440,933, was the patent application involved.

133) As stated in the Abstract of the Laboratory Report, the formula prescribed the maximum $B_2O_3$ percentage tolerable in a high purity magnesite brick without reducing the hot modulus of rupture at 2300° F below 500 psi. (Pt 61.)

134) Doctor Mueller, plaintiff's expert at trial, admitted after a lengthy cross examination, that a high purity magnesite brick which had a $B_2O_3$ content that approached the maximum percentage permitted by the formula would be a brick that had a modulus of rupture at 2300° F of at least 500 psi. (R. 1520.)

135) At column 5, lines 45–49 of the patent in suit, the following statement occurs: "As long as the $B_2O_3$ is kept below $\frac{(C+S)^2}{100\%}$ brick will have hot strength at 2300° F about 900 psi." That representation is simply not true. As indicated at trial by the testimony of plaintiff's expert, Doctor Mueller, an empirical formula, *similar* to the formula contained in the patent in suit, could be devised to define the maximum $B_2O_3$ content for brick having a modulus of rupture of 700 psi at 2300° F and for brick having a modulus of rupture of 900 psi at 2300° F; but these formulae would *not* be the same as the formula contained in the patent in suit. (R. 1512–1519.)

136) Using only the information contained in PT 61, Doctor Ulmer, defendant's expert, indicated at trial his interpretation of the derivation of the formula $\frac{(C+S)^2}{100\%}$ by the inventors. Using the graph contained in FIGURE 2 of the exhibits, in which the percent of lime (C) and silica (S) was plotted in direct relationship to the equation $\frac{B}{\% B+C+S}$, wherein B represented the $B_2O_3$ content and C and S represented the lime and silica content respectively, Doctor Ulmer theorized the following steps:

a. The plot of the data points contained in FIGURE 2 was expressed by the following mathematical equation:

$$\% (C+S) = \frac{B(100)}{\%(B+C+S)}$$

(The value of 100 was introduced into the equation as a constant factor to simplify the plotting of the data.)

b. The next step taken by the inventors was to drop the B term from the denominator of the right side of the equation, thus leaving:

$$\% \ (C + S) = \frac{B(100)}{\%(C + S)}$$

c. Solving the equation for B yielded the following:

$$\frac{\%(C + S)^2}{100} = \%B *$$

which is, of course, the formula contained in the patent in suit. (R. 1178–1185.)

137) On recross examination, Doctor Ulmer admitted that he was "guessing" as to the mathematical derivation of the formula contained in the patent in suit. (R. 1187.)

138) Doctor Mueller, plaintiff's expert, on direct examination as a rebuttal witness, testified that Doctor Ulmer's derivation of the formula was correct. (R. 1469–1472.)

139) The Court concludes that Doctor Ulmer's explanation for the derivation of the formula is correct.

140) Doctor Ulmer also testified that it would be mathematically proper to drop the B term from the denominator of the original equation, $\%(C + S) = \frac{B(100)}{\%(B + C + S)}$, only if the B term itself was low. He also testified that the elimination of the B term from the denominator in lime/silica systems such as those covered by the suit would introduce an error of 3% to 4%. The Court finds these statements to be true. (But see the footnote to Finding of Fact No. 136.) (R. 1179–1182.)

141) Doctor Ulmer also testified that the formula had no application whatsoever in respect to bricks in which the lime and silica constituted less than 1%. (R. 1184–1185.) This statement was corroborated by the testimony of Doctor Mueller, plaintiff's expert, on cross examination as a rebuttal witness (R. 1530–1535), and the Court finds Doctor Ulmer's analysis to be correct.

142) The Fourth Application, Serial No. 483,356, filed August 27, 1965, was supported by a continuation-in-part oath, thus indicating that it covered subject matter common to the three previous applications as well as new matter that had not been disclosed in the three previous applications. (PT 2, pp. 1–19.)

143) Claims 1 and 6 of the Fourth Application described respectively a dead burned synthetic magnesite refractory grain and a brick made therefrom, wherein the maximum $B_2O_3$ content was defined in terms of the formula $\frac{(C + S)^2}{100\%}$, which had a chemical composition outside the range set forth in Claims 1–3 of the Third Application, the application which originally introduced the $\frac{(C + S)^2}{100\%}$ formula. (PT 2, p. 14; DT ER, p. 13.)

144) On January 13, 1966, all of the claims of the Third Application were rejected by the examiner as being unpatentable (DT ER, pp. 21–22); on January 17, 1966, all the claims of the Second and Fourth Applications were rejected by the examiner as being unpatentable (DT EQ, pp. 28–29; PT 2, pp. 26–28); on January 19, 1966, all the claims of the First Application were rejected by the examiner as being unpatentable (DT EP, pp. 15–16).

---

*The Court has solved the original equation, $\%(C + S) = \frac{B(100)}{\%(B + C + S)}$, for B, and it is $\%B = \frac{\%(C + S)^2}{100-(C + S)}$, and it should be noted that the dropping of the B term from the denominator of the equation results in a *lower* quantity of $B_2O_3$ being permitted by the formula set forth in the patent in suit than the quantity which would be permitted by the $\%B = \frac{\%(C + S)^2}{100-(C + S)}$ equation.

145) By an amendment, received by the United States Patent Office on March 11, 1966, the inventors abandoned the first three applications in favor of the Fourth Application. Although the Fourth Application was originally directed only to *synthetic* magnesites, an amendment was also included to cover natural magnesites as well. (The amendment was brought forward from the First Application.) Additionally, the original fifteen claims of the Fourth Application were cancelled, and eighteen new claims were substituted therefor. (Pt 2, pp. 29–35.) Included with the amendments, filed on March 11, 1966, were Mr. William C. Nealon's remarks concerning the prosecution of the Fourth Application. (Mr. Nealon was the attorney who prosecuted the applications which ultimately resulted in the patent in suit.) In his remarks, Mr. Nealon stressed the following:

a. The essence of the applicant's invention was the "discovery that boron affected high temperature strength." (PT 2, p. 35);

b. The term "good modulus of rupture at 2600° F" was more than adequately defined by the data contained in Table 4 of the patent in suit, i. e., at least about 210 psi at 2600° F. (PT 2, p. 35.)

146) Mr. Nealon's remarks also contained the following statement: "As to the method (claims), the *art of record* indicates no appreciation of the critical importance or boron in a method of making brick." (Pt 2, p. 37.) (*Emphasis added.*)

147) The Heuer patent, U. S. Patent No. 2,999,759, issued on September 12, 1961, contained the following statement at column 4, lines 17–20: "Excessive and unnecessary quantities of boron compound are to be avoided as such excessive quantities adversely affect the loadbearing properties of the brick at high temperature." (Pt 2, p. 37.) It is unclear to the Court how Mr. Nealon could have made the statement referred to in Finding of Fact No. 146, above, in view of the fact that, by a letter dated November 24, 1964, he invited the attention of the examiner to the Heuer patent. (DT EQ, p. 21.)

148) The Court concludes that the three affidavits (PT 2, pp. 41–50), filed subsequent to the initial rejection by the examiner on January 17, 1966, were Rule 132 affidavits.

149) In regard to the Davies affidavit (PT 2, pp. 43–46), the Court makes the following conclusions:

a. The analyses of brick, stated as being *typical* of the samples studied at Garber Research Center, did not include an analysis of plaintiff's 78–62 brick, plaintiff's 7–63 brick or any samples of Anker T which plaintiff had analyzed;

b. Plaintiff's 78–62 brick and plaintiff's 7–63 brick were on sale in the United States more than one year prior to the initial application filed by the inventors (R. 704; DT EP);

c. PT 59, dated December 1, 1964, was the source document for all the information contained in Mr. Davies' affidavit concerning the analyses of the brick studied. That exhibit, however, also included an analysis of plaintiff's Oxibak H (the successor denomination for plaintiff's 7–63 brick) which indicated that its modulus of rupture at 2600° F was 260 psi, but that analysis was not provided to the examiner;

d. The inclusion in the affidavit of data concerning the modulus of rupture at 2600° F of plaintiff's Harklase brick, which had a modulus of rupture at 2600° F of 50 psi, was misleading insofar as the representation that the analyses reported in the affidavit were *typical* of the samples studied at Garber Research Center;

e. The failure to reveal to the examiner the modulus of rupture at 2600° F of plaintiff's prior art Oxibak H (7–63) brick constituted a concealment of relevant prior art, especially in view of the representation made in the affidavit that a modulus of rupture in excess of 200 psi exemplified good brick made under the claims of the patent in suit (PT 2, p. 46);

f. The fact that the examiner knew the modulus of rupture at 2300° F of plaintiff's 78–62 refractory from the data contained in TABLE V of plaintiff's U.S. Patent No. 3,141,790, is irrelevant in view of the statement contained in the specifications of the patent in suit that the 2600° F modulus of rupture test was a very severe test (PT 1, column 6, line 60; column 7, lines 1–6; PT 2, pp. 11–12);

g. The statement contained in the penultimate paragraph of the affidavit in which Mr. Davies averred that he had *obtained* "at least one of every commercially manufactured and sold, relatively high-purity, burned, magnesite brick being marketed in the United States," though true, is clearly misleading in view of the fact that the data relating to the modulus of rupture at 2600° F of plaintiff's Oxibak H, which was *not typical* of the physical property data of the other brick included in the affidavit, was neither reported in the affidavit nor otherwise revealed to the examiner, nor was any data included which related to Anker T samples received from the lining shipped to Sharon Steel.

150) On the basis of Finding of Fact No. 117, the Court finds that the following statement in the Birch affidavit,

"I can categorically state, as a fact, that the refractory grain and the brick which are disclosed and claimed in these patents (i. e., plaintiff's U.S.Patent No. 3,106,475 and U.S.Patent No. 3,141,790) *did not* have a chemical analysis coming within the claims of the present application"; (*Emphasis in original*),

is mildly misleading in view of the fact that Example 6 of the patent, an alleged practice of the invention, has a chemical analysis which *arguably* falls within the scope of some of the claims of plaintiff's U.S.Patent No. 3,141,790. (See also R. 735 to support the Court's interpretation that the Mg0 content under plaintiff's 3,141,790 patent could range as low as 95%.)

151) Veitsch introduced an improved version of its Anker T refractory in Europe in late 1962 known as Anker T–15. (DT HV; PT 152.)

152) Sharon Steel began negotiations to obtain an Anker T lining in April of 1963, and plaintiff was aware of that fact, as was Mr. Davies, one of the inventors. (PT 157.)

153) Sharon Steel executed a formal purchase order on September 6, 1963, and two change orders (one dated September 19, 1963, and the second dated January 1, 1964) to obtain an Anker T–15 lining from Veitsch. (DT B.)

154) The Anker T–15 lining arrived at Sharon Steel in mid-January, 1964 (DT BK), and it was installed on January 28, 1964. (PT 160.)

155) That Anker T–15 lining endured a 71 "heat" campaign which ended on February 11, 1964. (DT BQ.)

156) Sharon Steel, by a check dated March 2, 1964, in the amount of $58,617.41, made payment for the Anker T–15 lining which it had received from Veitsch. (DT BO.)

157) Veitsch represented to the United States Patent Office that the Anker T–15 lining installed in the Kaldo vessel at Sharon Steel in January, 1964, that the installation of the lining and all tests were carried out with the exclusion of the public and that teamwork with the firms chosen for such tests was carried out on the basis of the strictest confidence. (R. 436–437.)

158) Although the Heuer Patent, U.S. Patent No. 2,999,759, issued September 12, 1961, teaches the *addition* of boron bearing compounds to brickmaking batches as a means of preventing hydration, i. e., cracking, the Court concludes that it is the most relevant prior art cited by defendant. (PT 97.)

159) Although Heuer taught the *addition* of boron compounds, he also cautioned that:

"The quantity of boron compound when calculated on the weight of the dry refractory mix will be in the range between 0.02% and 0.30% and most desirably about 0.05%. From this information it is *evident* that the quantity of boron

compound required is *surprisingly small.*" (*Emphasis added.*) (PT 97, column 2, lines 64–69.)

160) Although Heuer taught the *addition* of boron compounds, he also taught that: "Excessive and unnecessary quantities of boron compound are to be avoided as such excessive quantities *adversely* affect the *loadbearing* properties of the brick at high temperature." (PT 97, column 4, lines 17–20.) (*Emphasis added.*)

161) Example 1 of the Heuer Patent reveals a brick made from Greek magnesite to which Heuer had added boric acic powder of sufficient quantity to bring the $B_2O_3$ content of the entire mixture up to 0.05% $B_2O_3$. (PT 97, column 3, lines 8–29.)

162) The only differences in the chemical composition of Example 1 of the Heuer Patent and Claim 10 of the patent in suit are: 1) That Claim 10 of the patent in suit calls for "at least about 90% MgO" and the MgO content of Heuer's Example 1 is 89.47% or 89.73% or 89.99%, as calculated by Doctor Mueller (R. 922–956); and 2) That Claim 10 of the patent in suit calls for "essentially less than 0.05% $B_2O_3$" and Example 1 of the Heuer Patent discloses a $B_2O_3$ content of 0.05%. (PT 97, column 3, lines 19–22; PT 1, columns 9 and 10, lines 40–47, 1–6.)

163) The Court concludes that the aforementioned differences in MgO content are differences without distinction or merit.

164) Scalistiri Grecian magnesite is obtained from natural ore deposits of altered igneous rock on the island of Euboea. (R. 1199–1212.)

165) The $B_2O_3$ content of the Scalistiri dead burned magnesite obtained from these natural ore deposits is extremely low in $B_2O_3$ content. (DT IC, p. 10; DT E; PT 40; R. 1199–1212.)

166) Scalistiri's method of "benefication" of the magnesite bearing natural ore (i. e., the removal of impurities from the ore to obtain a commercially marketable product which had a high MgO content) were conventional in nature at all times relevant to

this lawsuit, and such benefication techniques did not reduce the $B_2O_3$ content of the commercially marketed high MgO dead burned magnesite manufactured from the beneficated source material. (DT GI; DT HP; R. 309–313; R. 502–516.)

167) As a direct result of the low $B_2O_3$ content of the Scalistiri dead burned natural magnesite and the chemical composition thereof, brick manufactured from such material by conventional brickmaking techniques come within the scope of Claim 10 of the patent in suit.

## OPINION AND CONCLUSIONS OF LAW

### Claim 10

From the above Findings of Fact, it is clear that none of the research or testing conducted by plaintiff or the inventors had ever resulted in the testing of any high purity magnesite brick which had a modulus of rupture in excess of 2000 psi at about 2300° F at any time prior to May 28, 1963, the date of the Invention Record which purportedly disclosed what eventually became Claim 10 of the patent in suit. (Findings 17–21; 32–73.)

It is equally clear that neither plaintiff nor the inventors had made a high purity magnesite brick with a $B_2O_3$ content of 0.05% or less than 0.05% prior to May 28, 1963, nor had plaintiff or the inventors tested a high purity magnesite brick having a $B_2O_3$ content of 0.05% or less for modulus of rupture at 2300° F prior to that date. (Findings 35; 42–44; 49–71; 83–86; 94–98; see also the footnote to Finding 101.)

Plaintiff and the inventors were, at all times relevant to this cause, aware of the reputation of Anker T brick for hot strength in European oxygen steelmaking furnaces. Although Doctor Gilpin was not aware of any explanation for the hot strength of Anker T, he did reveal to the inventors that brick of similar quality to Anker T could be made by using Grecian magnesite. (Finding 44.)

In March of 1963, the inventors themselves, as a result of their study of the 78–62 refractories made from the 31–62 grain to which the hydrated dolomite had been added in December of 1962, were aware of the fact that the $B_2O_3$ content of those brick was twice as high as the normally anticipated range. (Findings 16–20.) They did not, however, know at that time what effect, if any, the increased $B_2O_3$ content had had upon the hot strength of the brick. (Finding 20.) Their research into the cause of the low hot strength of those refractories did not encompass any investigation or experimentation aimed at reducing the $B_2O_3$ content of plaintiff's 31–62 grain until June 3, 1963, when such an effort was first begun. (Finding 35.) That, needless to say, was one week after the date of the Invention Record.

The only data available to the inventors upon which they could have predicated their assertion that "*magnesite* (brick) with strength at 2300° F well over 2000 psi" could be produced by reducing the $B_2O_3$ content below 0.05% were:

1) The assertion made to them by Doctor Gilpin that he had been able to make a brick similar to Anker T (which according to Doctor Gilpin had a modulus of rupture of approximately 3000 psi at 2300° F) by using Grecian magnesite; and

2) The information they obtained relating to the $B_2O_3$ content of five samples of Scalistiri Grecian magnesite analyzed on April 12, 1963, and the $B_2O_3$ content of the used fragment of an Anker T Brick which was analyzed on May 9, 1963, each of which revealed a $B_2O_3$ content of less than 0.05% (less than 0.01% and 0.03% respectively).

Despite the fact that Mr. Davies denied any knowledge of the aforementioned analyses of the Scalistiri samples (R. 566–572) and the used Anker T fragment (R. 461–465) prior to May 28, 1963, it is clear that he was aware of the existence of the used Anker T fragment at plaintiff's laboratory on May 8, 1963, and that the tests were conducted the very next day. (Findings 30 and 31.) It is also clear that the Scalistiri samples were subjected to chemical analysis within eight days of the time when Mr. Davies originated the inquiry concerning the samples. (Findings 26 and 27.) The Court finds it highly unlikely that he was unaware of this information until June 17, 1963, at the earliest. (Findings 43–45; 50.) The Court also finds it difficult to believe Mr. Davies' expression of little interest in these materials in view of the fact that it took plaintiff only one week to analyze the Scalistiri samples after the request was first made and only twenty days to analyze the used Anker T sample from the time of its initial receipt. (Findings 26–29.) Mr. Davies' assertion of little or no interest in these materials is even more incredible in view of the fact that two of the inventors' Class II projects took seven weeks (PT 39) and twenty-three days (PT 35) respectively, and those two studies had had a high priority assigned to them. (Findings 55; 58–69.)

The Court is convinced that the evidence adduced clearly and convincingly shows that the references in the Invention Record to $B_2O_3$ content of less than 0.05% were predicated upon the analyses of the Scalistiri samples (less than 0.01% $B_2O_3$) and the used Anker T fragment (0.03% $B_2O_3$) and not upon any experimentation which plaintiff had performed on *dolomite* brick. (Finding 74 and the footnote thereto.)

In view of plaintiff's experience with the abnormally high $B_2O_3$ content of some of its refractories and the resultant adverse effect thereof upon their hot strength, plaintiff's knowledge of the reputation of Anker T in Europe for high hot strength, Doctor Gilpin's revelations to the inventors concerning Anker T and Grecian magnesite, and plaintiff's analyses of Scalistiri Grecian magnesite and the used Anker T fragment, it is clear that the inventors had concluded that a $B_2O_3$ content of less than 0.05% might be a scientific explanation for the reputed hot strength of these materials and products, and the fact that they reached this conclusion six days before they even under-

took their first research project to investigate what effects, if any, a *reduction* of $B_2O_3$ content of the materials with which they were working might have, clearly shows that Doctor Gilpin's statements concerning the brick he made from Grecian magnesite were the basis for the statement in the Invention Record concerning the hot strength which would be achieved.

In essence, Doctor Gilpin had instructed the inventors in April of 1963, that if they wanted to make brick having outstanding hot strength, all they had to do was to use Grecian or Turkish magnesite, and on May 28th the inventors set forth an explanation for why he was right. Claim 10 is, in fact, no more than a method claim which embodies a recitation of the chemical composition typical of Scalistiri's Grecian magnesite embossed by a recitation concerning $B_2O_3$ content that was sufficiently broad enough to cover the Turkish and Anker T in the process. No data, other than the analyses of Anker T and Scalistiri's Grecian magnesite, was available to the inventors on the date of the Invention Record to support the criticality of the "$B_2O_3$ content below *0.05*" recitation contained therein (Findings 74; 77), although there is a statement in the record which supports a limitation of less than *0.03* $B_2O_3$, written by Mr. Davies on or before June 17, 1963:

"To obtain improved strength of 7–63, it appears the $B_2O_3$ of 3–62 magnesite must be reduced below 0.03%. Burned *dolomite* brick made at GRC with $B_2O_3$ content of 0.02% had strength at 2300° F of 2400 psi. Veitsch's Anker T, *which is chemically the same* as 7–63, but has only 0.03% $B_2O_3$, is reputed to have very high hot strength." (*Emphasis added.*) (PT 36.)

It is also significant that the inventors' first reduction to practice of Claim 10 was accomplished by them in August of 1963, by doing exactly what Doctor Gilpin had told them to do, i. e., getting some Grecian (Scalistiri) magnesite and making some brick out of it. (Finding 83.)

The Court concludes that these inventors are not entitled to the benefits of a patent for the "concept" set forth in Claim 10. In the first place, the chemical recitations set forth therein are merely a chemical description of dead burned magnesites made from naturally existing ores by conventional benefication processes. And, secondly, the merits of this particular magnesite were revealed to the inventors by a third party, Doctor Gilpin, and their subsequent discovery of the significance of the $B_2O_3$ content of those materials is irrelevant insofar as the method set forth in the claim is concerned because the method can be practiced in total ignorance of the actual $B_2O_3$ content of the magnesites which Doctor Gilpin mentioned merely by using those magnesites (as Doctor Gilpin himself had managed to do) and making brick from them.

Plaintiff's reliance on such cases as *International Nickel Company v. Ford Motor Company*, 166 F.Supp. 551 (S.D.N.Y.1958), and *Nicholson v. Bailey*, 182 F.Supp. 509 (S.D.Fla.1960) is misplaced. Those cases, in fact support the defendant's position insofar as Doctor Gilpin's statements to the inventors are concerned.

In *International Nickel Company*, Mack Truck Company made a product which at times had the characteristics of the product for which International Nickel had obtained its patent. However, in upholding the Master's findings, the court, at 560, pointed out that:

"Mack was not merely ignorant of the scientific phenomena underlying modular iron. It is not that Mack knew it had a new iron but failed to appreciate that its unique properties were due to an alteration in graphite shape. Not only was Mack unaware that it had created a new iron but in fact Mack never consciously pursued the product here in question for any purpose."

Though the court later stated, at 561, that:

"(w)here the allegedly anticipating product was produced merely by chance and never recognized nor appreciated,

one who later discovers and ·recognizes the product may patent it * * *", it is clear that Doctor Gilpin recognized and appreciated the use of brick made from Scalistiri Grecian magnesite for BOF vessels and that he recognized and appreciated the physical properties of such bricks insofar as their strength was concerned at elevated temperatures.

Likewise, in *Nicholson v. Bailey, supra,* the fact that a parent tree which produced seedless naval oranges had existed as an unappreciated item for twenty-five years of its existence was held not to be a bar to the person who discovered its significance. But that case hinged upon the fact that no one appreciated the tree which bore its seedless fruit. That simply is not the fact in the instant case. Doctor Gilpin was fully aware of the fact that excellent refractories, like Anker T, could be made from some ·natural magnesites (Grecian and Turkish), and the fact that he was unaware of the significance of the $B_2O_3$ content of such materials did not negate the fact that he knew it.

More apt to describe the discovery of the present inventors is the language of the Supreme Court in *General Electric Company v. Jewel Incondescent Lamp Company,* 326 U.S. 242, 247, 66 S.Ct. 81, 83, 90 L.Ed. 43 (1945), wherein it stated that:

"If A without mentioning the element of strength patented a bulb which was extra strong, B could not obtain a patent on the bulb because of its strength, though he was the first to recognize that feature of it."

### The Formula Claims

Claims 1–9 and 11–14 of the patent in suit contain the $\frac{(C+S)^2}{100\%}$ formula as a means of defining the maximum $B_2O_3$ content permissible in high purity magnesite grain and refractories designed for use in basic oxygen furnaces. Each of the claims contains various recitations in regard to the chemical composition of such materials which set forth the permissible ranges of $MgO$, $CaO$, $SiO_2$, and $R_2O_3$ materials, as well as ratios governing the relationship between the $CaO$ and $SiO_2$ contents. Claims 3 and 6, in addition to imposing the formula, require a $B_2O_3$ content of less than 0.05%, and Claims 4 and 8 impose a range of 0.05%–0.01% $B_2O_3$. For the purpose of this portion of the discussion, two temperatures, 2300° F and 2600° F, and the modulus of rupture at those temperatures, 900 psi and about 210 psi respectively, will provide the focal points.

Those temperatures are relevant because of various statements made in the specifications of the patent and in the representations made to the patent office subsequent to the rejection of the first four applications.

The Court has thoroughly examined the data set forth in PT 61 upon which the formula $\frac{(C+S)^2}{100\%}$ was based. As discussed in Findings of Fact Nos. 131–141, the $\frac{(C+S)^2}{100\%}$ formula defines a maximum quantity of $B_2O_3$ that is sufficiently low to assure a modulus of rupture of 500 psi or more at 2300° F. That is not to say, however, that brick which contain a quantity of $B_2O_3$ which approaches the maximum quantity as determined by the formula will have a modulus of rupture of only 500 psi at 2300° F. On the contrary, as indicated by Examples 4 and 10 (as corrected) of the patent in suit and Mix B2 of PT 61, brick having a $B_2O_3$ content in excess of that permitted by the formula could have a modulus of rupture in excess of 500 psi at 2300° F, i. e., 680 psi, 660 psi, and 620 psi for those respective examples. Thus, though the formula establishes as a maximum $B_2O_3$ content a quantity that is sufficiently low to insure a modulus of rupture of more than 500 psi at 2300° F, it does not disclose what maximum hot strength above 500 psi one can anticipate at 2300° F. In other words, it establishes the floor of the first level, but it doesn't tell us how high the ceiling is from the floor.

Turning to the specifications set forth in the patent in suit, we find the following statements:

"* * * as long as the $B_2O_3$ content is kept below $\frac{(C+S)^2}{100\%}$ brick will have hot strength at 2300° F above about 900 psi." (Column 5, lines 46–49.)

and

"* * * if the CaO content is maintained in the range of 3 to 5% with more than 1% $SiO_2$ and a maximum of 3% $R_2O_3$ materials and a CaO:$SiO_2$ ratio of at least 2:1, the *full benefits* of the invention are obtained right up to the maximum boron content given by the expression $\frac{(C+S)^2}{100\%}$." (*Emphasis added.*) (Column 2, lines 40–46.)

The source document for the $\frac{(C+S)^2}{100\%}$ formula, PT 61, contains as one of the items tested a Mix B1. That mix contained 4.5% CaO (which is within "the range of 3 to 5%"); it contained 1.1% $SiO_2$ (which is "more than 1% $SiO_2$"); it contained less than 3% $R_2O_3$ materials ("maximum of 3% $R_2O_3$"); it had a CaO:$SiO_2$ ratio of 4.1:1 (which is more than "at least 2:1"); and it had a $B_2O_3$ content of 0.19% (which was less than the 0.31% permitted by the $\frac{(C+S)^2}{100\%}$ formula). In addition, its chemical composition clearly fell within the scope of Claims 11–14 of the patent in suit. Nonetheless, it had a modulus of rupture of *700* psi at 2300° F.

Those examples of the patent in suit which come closest to illustrating the efficacy of the formula or lack thereof at 2300° F are Examples 4, 5, 6, 10 and 12 since those are the examples in which the $B_2O_3$ content most closely approximates that permitted by the formula.

As discussed in Findings of Fact Nos. 115 and 116, and Table A thereto, the formula of the patent in suit would permit a $B_2O_3$ content of 0.55% (0.5476%) for the brick contained in Example 4. The actual $B_2O_3$ content thereof was 0.56%, yet its modulus of rupture at 2300° F was 680 psi. Clearly, that is not "about 900 psi", but given the relative magnitude of the quantity of $B_2O_3$ permitted, the actual $B_2O_3$ content is a mere fraction of a scintilla above that permitted by the formula, and the Court finds it extremely unlikely that a reduction of the $B_2O_3$ content from 0.56% to 0.55% would increase its modulus of rupture by 30%.[11]

Example 10 of the patent, which barely falls outside the scope of Claim 10, illustrates a brick which contains roughly 50% more $B_2O_3$ than that permitted by the formula (a scant 0.0176% more $B_2O_3$ by actual weight, however). That brick had a modulus of rupture of 660 psi at 2300° F (not 140 psi as indicated by the patent and the Fourth Application—see PT 51, Mix K), which, again, is more than 500 psi, considerably less than "about 900 psi," but fairly close to the 700 psi obtained in Mix B1 of PT 61.

Example 12 of the patent in suit purports to set forth a specific brick tested by the inventors as part of their research. As pointed out in Findings of Fact Nos. 120–122, Example 12 is clearly a distortion. It is, in theory, predicated upon typical data for plaintiff's C Grade magnesite, but the source document for the example, PT 51, gives the range of 0.10%–0.15% as the typical $B_2O_3$ content of C Grade magnesite, not 0.2% as indicated by Example 12. Although the evidence is conflicting in regard to the typical $B_2O_3$ content of the C Grade magnesite, as discussed in Finding of Fact No. 121, the data set forth in Example 12 cannot be viewed as supporting the criticality of the limitation upon the maximum $B_2O_3$ content established by the

11. If plaintiff complains of this example being used for this purpose because the *actual* CaO content is in excess of the 5% limitation set forth in the specifications (5.5% in PT 61, Mix C2), plaintiff must bear in mind that it was the party which distorted that mix and made it Example 4.

$\dfrac{(C + S)^2}{100\%}$ formula of the patent because that example is clearly a theoretical construction which contains a mere recitation of a 0.2% $B_2O_3$ content that is just not supported by the record.

Example 5 of the patent in suit is clearly an outstanding example in support of the validity of the $\dfrac{(C + S)^2}{100\%}$ formula. The example sets forth a $B_2O_3$ content of 0.40%, a quantity in excess of the normal range of $B_2O_3$ content of synthetic magnesites, but the formula, as applied to the chemical composition set forth, permits up to 0.45% (0.4489%) $B_2O_3$, and the modulus of rupture at 2300° F of 1000 psi is truly outstanding. Example 6 of the patent is likewise an outstanding example of the criticality of rigid control of the quantity of $B_2O_3$ permitted by the $\dfrac{(C + S)^2}{100\%}$ formula in that the formula defines 0.16% $B_2O_3$ as the maximum quantity permitted under the chemical composition of that brick and the brick contains 0.15% $B_2O_3$, yet, nonetheless, it had a modulus of rupture of 900 psi at 2300° F. Plaintiff, however, was unable to locate any supporting data for these outstanding examples, as it was unable to do for Example 17 of the patent which plaintiff itself characterized as an "outstanding" example.

The cumulative impact of the negligent misrepresentation of the moduli of rupture of the brick in Table 2 of the patent in suit as being measured at 2300° F, whereas in fact Table 2 sets forth their moduli of rupture at 2600° F, the omission of the modulus of rupture of Example 2 at 2600° F (discussed hereafter), the distortion of the CaO content of Example 4, and the assumed $B_2O_3$ content set forth in Example 12 all make the Court extremely reluctant to accept the otherwise understandable "lots of missing documents" argument of plaintiff and even more reluctant to place any trust in the data set forth in either Example 5 or Example 6. (See also the Court's discussion of Example 6 in Finding 117.)

The specifications of the patent, as well as Mr. Nealon's remarks and the Davies' affidavit submitted with the amendments to the Fourth Application, placed considerable emphasis upon the hot strength at 2600° F of the brick made according to the invention set forth in the patent in suit as measured by modulus of rupture. Plaintiff has taken the position, both with the examiner and in regard to the validity of Claim 15, that brick made according to the invention would have a modulus of rupture at 2600° F of about 210 psi. Additionally, much of plaintiff's argument concerning the importance of the invention dealt with the hot strength obtainable by practicing the invention. The clear implications of Table 4 of the patent, the language which accompanies it in the specifications, and the thrust of Messrs. Nealon's and Davies' comments in prosecuting the amendments to the Fourth Application are that brick made according to the invention have a "good modulus of rupture" at 2600° F and that "good" is defined in terms of Examples 14–17, i. e., somewhere in the range of 210–1140 psi.

Example 2 of the patent, which had the highest modulus of rupture at 2300° F of any of the examples set forth in the specifications (1360 psi), had a modulus of rupture of 125 psi at 2600° F according to the source document for that example, PT 216, Mix G. Mix H in that same exhibit, which had a chemical composition which fell within the scope of Claims 11–14 of the patent in suit, though having a modulus of rupture of 1160 psi at 2300° F, had a modulus of rupture of 180 psi at 2600° F. Mix I of the same exhibit, which had a chemical analysis which fell within the scope of Claims 11–14 (that is, if Example 6 of the patent fits those claims, so too does Mix I), had a modulus of rupture of 180 psi at 2600° F. (See Appendix A and B for additional examples which, though falling within the scope of some of the various claims of the patent, fail to conform to the recitals concerning hot strength at 2300° F and/or 2600° F.)

From the foregoing analysis, though unwilling to say that there is no empirical

validity whatsoever to the $\frac{(C+S)^2}{100\%}$ of the patent in suit, the Court concludes that the representations made concerning the hot strength obtainable by keeping the $B_2O_3$ content below the level determined by the formula are not supported by the record. As such, brick made according to the formula claims of the invention would not necessarily have the outstanding physical properties at elevated temperatures which the specifications indicate, and, as a consequence, the argument that brick made according to the formula claims of the patent in suit constituted an improvement over brick made within the highly restrictive $CaO:SiO_2$ limitations set forth in plaintiff's prior art U. S. Patent No. 3,141,790 because it permitted greater latitude in the manufacturing parameters loses much of its impetus in view of the fact that brick made under the formula claims would not necessarily have hot strength comparable to brick made under the teachings of plaintiff's U. S. Patent No. 3,141,790. (See R. 733–736.)

### Claim 15

█ The Court concludes that the scope of Claim 15 is limited to "synthetic grain" as that term is defined in Column 2, lines 1–5 of the patent in suit, i. e.,

> " * * * the type made from magnesia values recovered from *sea water*, bitterns, brines, and the like and to distinguish from grain made from *natural rock* by dead burning." (*Emphasis added.*)

Additionally, the Court concludes on the basis of the analysis in the previous section concerning the formula claims, that the term "good modulus of rupture at 2600° F" is not sufficiently defined by the examples set forth in Table 4 nor by the assertion by Mr. Davies in his affidavit (PT 2, p. 46) that brick made according to the "present invention are all over 200 psi" at 2600° F because those statements are plainly contradicted by the record which shows that some brick made according to the invention had a modulus of rupture at 2600° F in the range of 125 psi to 180 psi. As such, the claim is too indefinite to have any validity under 35 U.S.C., § 112.

### The Issue of Fraud on the Patent Office

"Although it is difficult to formulate a standard that will encompass all types of misconduct that would amount to inequity on the part of an applicant, the basic underlying theme is that there must be some element of wrongfulness, willfulness or bad faith that transgresses the basic concept of doing equity. It must be remembered that the purpose of the unclean hands doctrine in patent cases is to discourage an applicant from taking advantage of the fact that the prosecution of a patent application is essentially an *ex parte* rather than an adversary proceeding and that the Patent Examiner accordingly must rely heavily upon the information furnished to him by the applicant. However, to deny enforcement as a matter of law merely because of an innocent or good faith non-disclosure would go beyond what is necessary to protect the public against the improvident granting of a monopoly." *Xerox Corporation v. Dennison Manufacturing Company*, 322 F.Supp. 963, 968 (S.D.N.Y. 1971).

█ Bearing in mind that the defense of "unclean hands" and fraud on the Patent Office must be established by clear and convincing proof of dishonesty on the part of the applicant or those who are parties to Patent Office proceedings (*Hazel-Atlas Glass Company v. Hartford Empire Company*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Company*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)), the Court has examined the evidence presented in the record most carefully.

The record clearly reveals that Doctor Gilpin had "instructed" the inventors on the merits of a brick, which he had made from Grecian magnesite, that had excellent hot strength. (Finding 24.) He had also informed them that the brick made from Gre-

cian magnesite had physical hot strength properties similar to those of Anker T, a European brick which was a matter of interest to the inventors at that time because of its reputed hot strength and its performance in the smaller-than-U. S. basic oxygen furnaces, including Kaldo vessels. (Findings 4, 23, 45.)

Prior to the Gilpin conversation, beginning in January of 1963, plaintiff began a research project to determine the effect of using a more economical method of making lime additions to its 31–62 grain, the grain used for plaintiff's 78–62 and 7–63 refractories. (Finding 17.) That project, however, was soon expanded in scope when it was determined that the brick made from the new 31–62 grain had a modulus of rupture that was 50% lower than previous 7–63 brick. (Finding 18.) A letter in the report, dated March 4, 1963, indicated that there was not, at that time, any explanation for the marked decrease in hot strength. (PT 33, p. 5.) The final report, dated March 12, 1963, noted that the $B_2O_3$ content of the new 31–62 grain was more than twice that normally contained in the material, but the report did not indicate that the $B_2O_3$ content was the cause of the problem—it merely noted that additional studies would be conducted to determine what effect, if any, the $B_2O_3$ content had upon hot strength. (Finding 19.) The project referred to in the above report began on March 6, 1963, and ended on June 20, 1963, and it related solely to efforts to determine the effect of *increasing* the $B_2O_3$ content of plaintiff's 31–62 grain. (Finding 42.) None of plaintiff's research prior to June 3, 1963, involved a study of the effects of *decreased* $B_2O_3$ content on its 31–62 grain. (Findings 43, 50–57.)

Plaintiff's first effort to *reduce* the $B_2O_3$ content of its material began on June 3, 1963. (Findings 42, 43, 50–57 and 35.) That project, which ended on August 9, 1963, did not involve any brick with a $B_2O_3$ content of less than 0.063%. (Findings 58–73.)

As such, none of plaintiff's research projects in the record prior to May 28, 1963, support the recitation in the Invention Record that less than 0.05% $B_2O_3$ is a critical level for *magnesite* refractories. Any reliance on statements concerning dolomite refractories is wholly misplaced, if not irrelevant, because of the radically different chemical composition of such systems. The only data which support the $B_2O_3$ recitation are plaintiff's analysis of the Scalistiri samples (April 12, 1963) and the used sample of Anker T (May 9, 1963). (Findings 27 and 31.)

Likewise, the recitation in the Invention Record which relates to modulus of rupture in excess of 2000 psi for *magnesite* refractories at 2300° F had no experimental support from *any* of plaintiff's research prior to 1964. (Findings 83–87, 98, 101 and the footnote thereto.) The only basis for the statement—dolomite aside—in the Invention Record was Doctor Gilpin's statements about Anker T and the brick he had made from Grecian magnesite.

Although the record clearly establishes that Mr. Davies knew the $B_2O_3$ content of the used fragment of Anker T by June 17, 1963, (Finding 144) and that he knew the density and porosity of Anker T by June 13, 1963, (Finding 54) plaintiff would have the Court believe that Mr. Davies was unaware of its chemical analysis prior to May 28th. The evidence to the contrary is overwhelming.

Even disregarding the recitations in the Invention Record which could have been predicated upon Doctor Gilpin's statements concerning only Grecian magnesite and plaintiff's analysis of the Scalistiri samples, the record clearly reveals that Mr. Davies was interested in Anker T when he talked to Gilpin, that he was aware of the existence of a small used fragment of Anker T in plaintiff's laboratory on May 8, 1963, one day before it was chemically analyzed, and that plaintiff placed an order for a shipment of Scalistiri magnesite on May 22, 1963, at a time six days *prior* to the date of conception in the Invention Record, as a result of the inventors' knowledge of the effects of low boron. (Findings 45, 29–30, 94, 32; R. 615–620; 749–755.) The Court

places no more emphasis on the dates of the first two reports in which Mr. Davies mentioned Anker T (June 13 and 17, 1963, *supra*) to establish the date he first became aware of its analysis than it does on the date of the first report which mentions an analysis of Scalistiri magnesite, reported by Mr. Good on June 17, 1963, (DT E) to establish that as the date when Mr. Davies first became aware of the analysis of Scalistiri magnesite, especially since Mr. Good and Mr. Davies shared the same office (R. 753), and even less emphasis on the first report relating to the original analysis of the used Anker T fragment because it was not written until January 14, 1964, almost seven months after Mr. Davies had indicated his knowledge of the analysis. (PT 46; PT 36; PT 285.) The time lag in plaintiff's writing of its final reports is far less indicative of its interest in the subject matter thereof than the dispatch with which plaintiff performed its analyses on what were purportedly non-priority studies and the promptness with which it acted upon its completion of those analyses. (See the discussion, *supra*, at p. 182.)

The Court, therefore, concludes that the method revealed to the inventors by Doctor Gilpin, i. e., make bricks out of Grecian magnesite if you want bricks as strong as Anker T, does not differ from the method revealed in the Invention Record or Claim 10 of the patent in any way other than the fact that those items recite a maximum $B_2O_3$ content, and one can practice Gilpin's method in complete ignorance of $B_2O_3$ content and get the same result without any knowledge of the $B_2O_3$ content of the Grecian magnesite. The oath of the inventors that stated that they were the inventors of the method disclosed in Claim 10 was, therefore, patently false, and that finding is borne out by the fact that plaintiff's first reduction to practice of Claim 10 was accomplished by doing exactly what Doctor Gilpin had told them to do. (Finding 83.)

In the course of plaintiff's prosecution of the four applications which ultimately resulted in the issuance of the patent in suit, plaintiff was guilty of making so many misrepresentations in the specifications and examples set forth therein that the Court is unwilling to regard those misrepresentations as anything less than deliberate. There is no basis for regarding them as innocent mistakes. The course of conduct is clear.

To begin with, the First Application contained a recitation which squarely reads upon the recitation of the Invention Record. (Finding 101.) The Invention Record, however, was cautious enough in its phraseology to indicate that only "some data" is available to *suggest* that a modulus of rupture of 2000 psi could be obtained at 2300° F if the $B_2O_3$ content is kept below 0.05%. The First Application, however, at page 4, states that actual brick were made and tested to arrive at the results stated. As indicated by the footnote to Finding of Fact No. 101, plaintiff never made any brick prior to the filing of the First Application which had a modulus of rupture of more than 2000 psi at 2300° F.

The First Application, at pages 2–3, recited a method of removing boron from commercial dead burned magnesite grain; this method was carried forward as Example 18 of the patent. As indicated by Findings of Fact Nos. 102–105, that recitation in the initial application did not reflect any experimental work performed by plaintiff prior to the filing of the application. Additionally, Example 18 of the patent recites an experiment in which the $B_2O_3$ content of dead burned magnesite was reduced from 0.14% to 0.03% by the addition of .5% and 1% of sodium carbonate, and none of plaintiff's research, including PT 51 which dealt with sodium carbonate additions to *caustic*, not dead burned, magnesite, indicates any such result as that set forth in Example 18. The recitations, therefore, are either fabrications or the result of gross negligence in their compilation.

Example 19 of the patent, though originally predicated upon sodium chloride, sodium fluoride, and sodium carbonate additions to magnesium hydrate as indicated by page 3 of the First Application, recited an

experimental removal of $B_2O_3$ from *dead burned* magnesite, not magnesium *hydrate,* and, as indicated by Findings of Fact Nos. 106–109, that representation was unsupported by any research, and, again, was either patently fabricated or negligently compiled.

Example 2 of the patent, though said to be a brick made according to the teachings of the patent, and though having the highest modulus of rupture at 2300° F of any of the examples set forth in the patent, had a modulus of rupture of only 125 psi at 2600° F, far less than the 210–250 psi range later described by plaintiff's agents as a maximum hot strength range for bricks made according to the teachings of the patent. (Findings 111–112.) That convenient oversight might well have been simple negligence.

Example 4 of the patent in suit is a deliberate distortion in three respects. In the first place, the amount of $CaO$ stated in the example is .5% less than that set forth in the source document. That is misleading for two reasons. First of all, it allows the brick to remain within the 5% $CaO$ limitation set forth in Column 2 of the specifications, and secondly, it decreases the amount of $B_2O_3$ permissible by the $\frac{(C+S)^2}{100\%}$ formula from 0.55% to 0.47%. In addition, the example misstates the modulus of rupture of the brick by 80 psi. The intent to deceive is clear. (Findings 114–116.)

Table 2 of the patent misstates the moduli of rupture of all the brick at 2300° F. It actually reveals their moduli of rupture at 2600° F according to its source document PT 51. (The same table, as set forth in the Second Application, misstated the same moduli of rupture figures set forth in he patent because it indicated the tests were conducted at 2700° F.) As indicated previously, in Finding of Fact No. 119, the Court does not make much of a fuss about the mistake, nor the other minor deviations from the source document noted in TABLE B, *supra.* However, the representation that Example 11 did not fail the loat test at 2700° F, whereas in fact it failed after one hour as indicated by Mix L of PT 51, even if merely careless, is positively misleading.

For the reasons discussed in Findings of Fact Nos. 121–122, the $B_2O_3$ content set forth in Example 12 is misleading in the sense that Example 12 purportedly is an analysis of brick actually tested for chemical composition and modulus of rupture by the inventors. In fact, the data is *typical data* for H–W C Grade magnesite, and the typical data set forth in the source document gives a range of $B_2O_3$ from 0.10% to 0.15%, not 0.2% as set forth in Example 12. Although there is some evidence to indicate that a $B_2O_3$ content of 0.2% was not unlikely in H–W C Grade magnesite, the chemical composition set forth in Example 12 is not described as being a probable composition nor even a very likely composition. It was described as an actual sampling, and, in view of the fact that the listed $B_2O_3$ content was a mere 0.015% in excess of that permitted by the formula, the example must be viewed as less than forthright.

Plaintiff was unable to locate any support for Examples 5, 6, and 17 of the patent. That, in itself, means very little in view of the tremendous number of documents in plaintiff's files and the lapse of time between the research phase and litigation.

As discussed in Findings of Fact Nos. 124–129, however, Example 17 of the patent can be nothing less than a fictitious brick which has a chemical composition that closely approximates the actual chemical composition of an Anker T brick which plaintiff obtained from those shipped by Veitsch to Sharon Steel.

The original analysis of that Anker T is set forth in PT 160, which among other data, indicated a $SiO_2$ content of 1.1%, an $Al_2O_3$ content of 0.1%, a $Fe_2O_3$ content of 0.3%, a $CaO$ content of 2.7%, and a $B_2O_3$ content of 0.015%. That exact same date was carried forward to PT 52 in the same column headed Anker T. However, for some unknown reason, the $CaO:SiO_2$ ratio, correctly calculated at 2.45:1 by the $CaO$

and $SiO_2$ data supplied in both PT 160 and PT 52, was incorrectly listed at 2.3:1 in PT 52. The modulus of rupture of 1170 psi at 2300° F in PT 160 was not carried forward to PT 52. The modulus of rupture at 2600° F, listed as 1160 psi in PT 160, was incorrectly listed as 1140 psi in PT 52.

Example 17, though varying from PT 160 and PT 52 in $SiO_2$ content (0.9% compared to 1.1%), in $Al_2O_3$ content (0.4% compared to 0.1%), and $CaO$ content (2.1% compared to 2.7%), was identical in its $Fe_2O_3$ content (0.3%) and $B_2O_3$ content (0.015%). Additionally, Example 17 contained the same $CaO$:$SiO_2$ ratio of 2.3:1 as that listed incorrectly in PT 52 for the Anker T, and the same modulus of rupture of 1140 psi at 2600° F as that incorrectly listed in PT 52 for the Anker T.

Table 4 of the patent contains Examples 14, 15, 16 and 17. Examples 14, 15 and 16 come from PT 52. The faulty analysis of Anker T is right next to them in PT 52. There is no question in the Court's view that Example 17 was in fact nothing more than the faulty analysis of Anker T set forth in PT 52 and modified slightly in $SiO_2$, $CaO$ and $Al_2O_3$ content.

Although the Court is unwilling to state that Examples 5 and 6, both of which represent outstanding examples of the formula claims, are fictitious examples solely on the basis of the fact that plaintiff likewise could locate no support for them, the Court is nonetheless unwilling to place any reliance upon them.

As indicated in the discussion of the formula claims, *supra*, at pp. 184–187, the evidence in the record in regard to the $\frac{(C+S)^2}{100\%}$ formula of the patent establishing a reliable guide for obtaining a modulus of rupture at 2300° F of at least about 900 psi and about 210 psi at 2600° F is conflicting. Brick made within the teachings of the patent ranged as low as 700 psi to 460 psi (Mix B1, PT–61; Mix F1, PT 50) at 2300° F, and 180 psi to 125 psi at 2600° F (Mix D, PT 47; Mix G, PT 216, which became Example 2 of the patent).

Although such discrepancies could have gone unnoticed in PT 47 and PT 50, they should not have gone unnoticed in PT 61, the document which provided the data which gave birth to the formula, if that formula really provided a guide for producing brick with a modulus of rupture of at least about 900 psi at 2300° F, nor should the modulus of rupture of Example 2 at 2600° F, as set forth in PT 2lb, have escaped plaintiff's attention. They each contained information relevant to the matters set forth in the specifications, and yet that matter was not revealed to the examiner.

In late February of 1966, long after the testing of an Anker T lining at Sharon Steel in Sharon, Pennsylvania, an affidavit by Mr. Birch and one by Mr. Davies were submitted to the patent examiner. According to Mr. Birch's affidavit, Mr. Davies' affidavit reported on test results of "various competitive *products*" and "competitive products" was defined as "i. e., competitive to Harbison-Walker (plaintiff's) magnesites." (PT 2, p. 49.) Mr. Davies' affidavit included analyses of magnesites and bricks. (PT 2, pp. 44–45.)

Mr. Davies' affidavit defined those *magnesites* which would be discussed as "all commercially available high-quality, synthetic, refractory brickmaking magnesites currently being produced in the United States" of which Mr. Davies was aware. His analyses of magnesites did not include any analyses of any of plaintiff's magnesites, and, as he indicated at trial, his reason for not including any of plaintiff's magnesites was that Mr. Birch's affidavit told the examiner that Mr. Davies' affidavit dealt with competitive products, as that term was defined in the Birch affidavit. (R. 680; R 684–685.) Consequently, the definition of *magnesites* in the Davies. affidavit as being "*all* commercially available, high-quality, synthetic, refractory brickmaking magnesites currently being produced in the United States" of which he was aware, was redefined by the "competitive products" restriction and definition set forth in the Birch affidavit. (Perhaps the author of the Dav-

ies affidavit felt it would be too confusing to add a tenth limitation on the definition of *magnesites* as set forth in the Davies affidavit and decided to include the tenth limitation in a totally separate document so that the reader would not have to forage his way through something like "all *competitive,* commercially available, high-quality, synthetic, refractory brickmaking magnesites currently being produced in the United States by persons or firms other than Harbison-Walker (plaintiff) that I am aware of.")

As a result of these definitional limitations, none of plaintiff's *magnesites* were included in the analyses set forth in the affidavit. (R. 676–689.)

In regard to *bricks* discussed in the affidavit, Mr. Davies informed the examiner that in further pursuit of the discovery of the importance of boron, plaintiff conducted a study of "various other competitors' * * * brick" as well as "one Harbison-Walker brick." He further informed the examiner that the analyses of those bricks "should be considered *typical* of the samples studied" by plaintiff. (*Emphasis added.*) And, he later informed the examiner that the above-mentioned comparative tests were conducted by Mr. Davies at a time when he had "obtained at least one of every commercially manufactured and sold, relatively high-purity, burned, magnesite brick being marketed in the United States." (PT 2, p. 46.)

Again, under the terms of the definitional limitations contained in Mr. Davies' affidavit, plaintiff's products should have been included in the analyses set forth in the affidavit, and, indeed, *one* such product was included, plaintiff's Harklase, which had a modulus of rupture of 50 psi at 2600° F. That certainly was a *typical* strength figure for brick being made by plaintiff's domestic competitors in the United States, but it was not *typical* of the strength figures for plaintiff's prior art 78–62 and 7–63 refractories which had a modulus of rupture in excess of 200 psi at 2600° F.

Mr. Davies explained this discrepancy, not by relying upon Mr. Birch's definition of "competitive products" as defined in the Birch affidavit since that limitation had been eliminated implicitly by the inclusion of plaintiff's Harklase, but rather by pointing out that he was not trying to differentiate between brick made under the patent in suit and brick made under U. S. Patent No. 3,141,790 on the basis of *strength.* (R. 699, 711.) And, upon examination of Mr. Nealon's remarks covering the interview, one finds an ambiguous remark which can be construed to mean that high temperature strength comparisons were made only with products manufactured by persons or firms who were "competitors" of plaintiff, if one ascribed the same definition to "competitive" as Mr. Birch attached to it in his affidavit. (PT 2, p. 37.)

The Anker T analyses available to Mr. Davies were not included in the analyses pertaining to those reported for "various other competitors", even though Anker T was a "commercially manufactured * *, relatively high-purity, burned, magnesite brick" which had been " * * * sold, * * * ", not only in Europe but once to a firm in the United States. As Mr. Davies explained at trial, the analyses of Anker T were not included in his affidavit because his attorney had excluded Anker T, in Mr. Davies' opinion, because Anker T "just wasn't commercially manufactured or sold or being marketed in the United States," or, as he later put it, "It wasn't manufactured here and it wasn't marketed here at that time." (R. 717.)

As the Court reads the clause "I obtained at least one of every commercially manufactured and sold, relatively high-purity, burned, magnesite brick being marketed in the United States" the only term modified by the phrase "in the United States" is "being marketed," not the word "manufactured" nor the word "sold." Hence, if the entire paragraph in which the clause appears relates back to the previous analyses of the competitors' brick and the Harklase, which were characterized as *typical* of the samples studied in plaintiff's laboratory,

then, in terms of the language used in the affidavit, the Anker T analyses could only have been excluded from the affidavit if:

a. Anker T was not "being marketed" in the United States in December of 1964 (the date of the report, PT 59, which provided the analyses in the affidavit), and, hence, outside the "defined" scope of samples which Mr. Davies said he had obtained; or

b. If the manufacturer of Anker T was not one of plaintiff's competitors, and, hence, outside the scope of the "various other competitors' * * * brick" limitation contained in the paragraph preceding the "typical" analyses.

In limiting the "best of his knowledge and belief" to the time the comparative tests were run (November 12–December 1, 1964), Mr. Davies was able to avoid whatever problems the use of an Anker T lining at Sharon Steel in January–February of 1964 might have presented insofar as the matter presented in the Third Application was concerned. (Findings 142–143.) Disregarding the Court's Findings of Fact Nos. 88–92 in regard to the inventors' awareness of the chemical analysis of the used Anker T fragment prior to the date of the Invention Record, plaintiff's decision to exclude the Anker T analysis from the data presented to the examiner on the basis of its unilateral decision that the use at Sharon Steel was not a "prior use" under the patent laws of the United States, and its subsequent attempt to justify that nondisclosure on the basis of limiting the meaning of "marketed in the United States" to a time period some nine months after the use of an Anker T lining at Sharon Steel was, it must be said, less than candid. The fact that the Anker T sample from Sharon Steel had a chemical composition which fell within the chemical limitations of two of the three claims of the

Third Application, eight of the fifteen amended claims of the patent, and a chemical composition which closely approximated that of Example 17 of the Fourth Application and the patent, and a modulus of rupture in excess of that of Example 17 at 2600° F, made that nondisclosure even less candid.

Plaintiff's explanation for not presenting information to the examiner which related to the hot strength of plaintiff's prior art 78–62 and 7–63 refractories at 2600° F is likewise less than satisfactory. The fact that the examiner knew that they were "strong bricks" at 2300° F does not mean that the examiner had any knowledge of their strength at 2600° F. One of the reasons for submitting the Davies and Birch affidavits, according to Mr. Davies (R. 710) and plaintiff's reply brief (PRB 39), was to give the examiner a better picture of the state of the art. That explains why it provided the information concerning the chemistry and modulus of rupture of six bricks manufactured by plaintiff's competitors and plaintiff's Harklase brick, but it provides no explanation for not including the same information about its own 78–62 and 7–63 refractories. Nor does the explanation that the examiner knew it was a "strong brick" justify the failure to inform the examiner of just how strong it was at 2600° F so that he could properly compare it to brick made according to the formula claims of the patent; especially in view of the fact that some evidence in the record indicates that some brick made according to the formula claims would have had a modulus of rupture at 2300° F below that of "above about 900 psi" and a modulus of rupture at 2600° F below that of the 78–62 and 7–63 refractories.

In the same manner, the Birch affidavit, though drafted with such precision so as not to contain any positive misrepresentations,[12]

---

12. This assumes that Birch's "categorical" statement that brick and grain disclosed in plaintiff's U.S. Patent No. 3,141,790 did not have a chemical analysis coming within the claims of the patent in suit is true because the statement concerning the patent in suit is limited to the language of the claims and excludes the examples set forth in the patent.

**194**

revealed far less of the state of the art than Mr. Birch knew. He knew that *brick* having low $B_2O_3$ content were not *unique* because he was aware of the existence of the Anker T samples; but he informed the examiner only of the fact that the inventors were the first to formulate the "concept" that low $B_2O_3$ content was a significant factor in the strength of magnesite refractories.

It is clearly established by the affidavits themselves that the intent underlying them was to give the examiner a carefully limited view of the state of the art which was substantially less full than that known by the affiants to be the state of the art at the time they executed their affidavits. Even assuming that the Anker T use at Sharon Steel was not a prior use under the language set forth in *Electric Storage Battery Company v. Shimadzer*, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939), the fact remains that such a determination should have been made by the examiner, not plaintiff's agents. By the same token, the fact that plaintiff's U.S. Patent No. 3,141,790 may have been nothing more than a species of the broad generic claims of the patent in suit, did not relieve plaintiff of its responsibility to set forth the true state of the prior art established by those refractories at 2600° F so that a fair comparison could be made by the examiner of the respective merits of products made under both inventions.

As stated by the Sixth Circuit in its opinion in *Charles Pfizer & Company v. Federal Trade Commission*, 401 F.2d 574 (6th Cir. 1968), at 579:

"The Patent Office, not having testing facilities of its own, must rely upon information furnished by applicants and their attorneys. Pfizer and Cyanamid, like all other applicants, stood before the Patent Office in a *confidential relationship* and owed the obligation of *frank and truthful* disclosure." (*Emphasis added.*)

The rationale for such a policy is clearly predicated upon the fact that a patent bestows a governmentally sanctioned monopoly. And, as the Supreme Court stated: " * * * a patent is an exception to the general rule against monopolies and the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Company, supra*, 324 U.S. at 816, 65 S.Ct. at 998.

To obtain the benefits afforded to such monopolies, the applicants and their attorneys have been saddled with the responsibility of dealing with the Patent Office in the same manner as any person dealing with another in a confidential relationship. Candor and honesty, not half-truths and stilted information, are the hallmarks of such a relationship. "Concealment and nondisclosure may be 'evidence of and equivalent to a false representation, because the concealment or suppression is, in effect, a representation that what is disclosed is the whole truth' ", and the failure to disclose all relevant information because it might jeopardize the status of one's application in the Patent Office amounts to a "misrepresentation transgressing equitable standards of conduct owed the public by the applicant in return for (his) monopoly." *Monsanto Company v. Rohm & Haas Company*, 456 F.2d 592 (3rd Cir. 1972) at 599–600.

It is obvious to the Court that the issuance of U.S. Letters Patent No. 3,275,461 resulted primarily from the submission of the affidavits of Mr. Birch and Mr. Davies, the co-inventor, and from the representations made to the patent examiner at vari-

ous interviews by the attorney for plaintiff's predecessor, Mr. Nealon. It is obvious to the Court from a reading of the Nealon deposition that he revealed only those portions of the record to the patent examiner which would sustain a claim for an alleged new discovery in spite of prior data known to him which was not fully revealed to the patent examiner.

The patent examiner, having thrice before rejected the claims, relied heavily upon the affidavits of Mr. Birch and the co-inventor, Mr. Davies. The affidavit of Mr. Davies said precisely what attorney Nealon wanted it to say, which, insofar as the co-inventor was concerned, was true, but it was obviously not a full disclosure.

It is clear from the inaccuracies in the applications that U.S. Letters Patent No. 3,275,461 were procured by conduct designed to overcome the objections of the patent examiners to the prior applications. This was accomplished by revising the claims and data presented and by knowingly concealing relevant research data that might well have prompted another denial by the patent examiner. This amounted to more than ingenuous or careless processing of a patent application. It was self-servingly obtuse and duplicitous.

On the basis of the foregoing analyses, the Court concludes that the entire prosecution of the patent in suit was laden with deliberate misrepresentations and willful omissions of relevant information of such magnitude and scope as to justify the denial of enforcement of plaintiff's Letters Patent No. 3,275,461 under the unclean hands doctrine and the dismissal of plaintiff's claim for relief on the same basis.

It is, therefore, the conclusion of the Court that:

1) Claim 10 of plaintiff's U.S. Letters Patent No. 3,275,461 is invalid and void under the provisions of 35 U.S.C., § 102(b).

2) Claim 15 of plaintiff's U.S. Letters Patent No. 3,275,461 is invalid and void under the provisions of 35 U.S.C., § 112.

3) Plaintiff's U.S. Letters Patent No. 3,275,461 were procured by fraud upon the Patent Office by plaintiff and its representatives who prosecuted the application on behalf of plaintiff, and, as such, said Letters Patent are unenforceable.

4) Defendants are granted leave to submit a schedule for attorneys fees as provided by 35 U.S.C., § 285.

An Order will be entered accordingly.

IT IS SO ORDERED.

Appendix A to follow.

## APPENDIX A

### PT 47

| | Mix A* | Mix D** | Mix E*** | Mix F** |
|---|---|---|---|---|
| $\frac{(C+S)}{100}$% $^2$ | 0.09% | 0.067% | 0.067% | 0.073% |
| $B_2O_3$ | 0.02% | 0.041% | 0.075% | 0.12% |
| M.O.R. (psi) | | | | |
| 2300° F | 1260 | 1280 | 1320 | 1100 |
| 2600° F | 170 | 180 | 200 | 180 |

*$B_2O_3$ well below 0.09% permitted by formula, yet M.O.R. at 2600° F is only 170 psi (Claim 1).

**$B_2O_3$ below 0.067% permitted by formula, yet M.O.R. at 2600° F is only 180 psi (Claim 1).

***$B_2O_3$ above 0.067% permitted by formula, yet M.O.R. at 2300° F is 1320 psi and 200 psi at 2600° F (Claims 1 and 4).

**$B_2O_3$ above 0.073% permitted by formula, yet M.O.R. at 2300° F is 1100 psi and 180 psi at 2600° F (Claim 1).

Appendix B to follow.

## APPENDIX B.

PT 50

| | Mix C* | Mix E2** | Mix F*** | Mix F1** |
|---|---|---|---|---|
| $\dfrac{(C+S)^2}{100\%}$ | 0.348% | 0.073% | 0.073% | 0.078% |
| $B_2O_3$ | 0.09% | 0.05% | 0.04% | 0.06% |
| M.O.R. (psi) 2300° F 2600° F | 770 170 | 950 160 | 570 120 | 460 160 |

*$B_2O_3$ well below 0.35% permitted by formula, yet M.O.R. at 2300° F only 770 psi and 170 psi at 2600° F (Claim 11).

**$B_2O_3$ below 0.073% permitted by formula, yet M.O.R. at 2600° F only 160 psi (Claim 1).

***$B_2O_3$ below 0.073% permitted by formula, yet M.O.R. at 2300° F only 570 psi and 120 psi at 2600° F (Claim 1).

**$B_2O_3$ below 0.078% permitted by formula, yet M.O.R. at 2300° F only 460 psi and 160 psi at 2600° F (Claim 4).

198

## ORDER

This cause is before the Court on defendant's motion pursuant to 35 U.S.C., § 285, and to ¶ 4 of the June 11, 1975, "Judgment Order" of the Court, for entry herein of a judgment directing that defendant shall recover from plaintiff the sum of Four Hundred Twenty Three Thousand Three Hundred Forty Three Dollars Thirty Eight Cents ($423,343.38), constituting a reasonable attorney fee.

This being an exceptional case pursuant to 35 U.S.C., § 285, and to ¶ 4, the Court reiterates what it had said in its Findings of Fact and Conclusions of Law. Although the judgment is tantamount to a finding of fraud in fact on the patent office, because of the diligent and zealous efforts of plaintiff's counsel, the Court finds that the fraud was neither intentional or exercised with malice or with any sense of wrongdoing.

However, in accordance with the Findings of Fact and Conclusions of Law, which are extensive, the Court finds that the defendant shall recover from the plaintiff the sum of Four Hundred Twenty Three Thousand Three Hundred Forty Three Dollars Thirty Eight Cents ($423,343.38) as reasonable attorney fees in this cause.

The Court further finds that even though the defendant may have used a "vacuum cleaner approach" or an "insatiable curiosity" in pursuing his discovery, that would not have had to occur except for the filing of this lawsuit by the plaintiff.

Therefore, the Court finds that defendant shall recover Four Hundred Twenty Three Thousand Three Hundred Forty Three Dollars Thirty Eight Cents ($423,343.38) as reasonable attorney fees herein.

IT IS SO ORDERED.